# BOARD OF EDUCATION OF KIRYAS JOEL VILLAGE SCHOOL DISTRICT *v.* GRUMET

No. 93–517.   Argued March 30, 1994—Decided June 27, 1994*

*Together with No. 93–527, *Board of Education of Monroe-Woodbury Central School District* v. *Grumet et al.*, and No. 93–539, *Attorney General of New York* v. *Grumet et al.*, also on certiorari to the same court.

Souter, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–B, II–C, and III, in which BLACKMUN, STEVENS, O'CONNOR, and GINSBURG, JJ., joined, and an opin-

ion with respect to Parts II (introduction) and II–A, in which BLACKMUN, STEVENS, and GINSBURG, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 710. STEVENS, J., filed a concurring opinion, in which BLACKMUN and GINSBURG, JJ., joined, *post*, p. 711. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 712. KENNEDY, J., filed an opinion concurring in the judgment, *post*, p. 722. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and THOMAS, J., joined, *post*, p. 732.

*Nathan Lewin* argued the cause for petitioners in Nos. 93–517 and 93–527. With him on the briefs was *Lisa D. Burget*.

*Julie S. Mereson*, Assistant Attorney General of New York, argued the cause for petitioners in No. 93–539. With her on the briefs were *G. Oliver Koppell*, Attorney General, *Jerry Boone*, Solicitor General, and *Peter H. Schiff*, Deputy Solicitor General. *Lawrence W. Reich* and *John H. Gross* filed briefs for petitioner Board of Education of the Monroe-Woodbury Central School District.

*Jay Worona* argued the cause for respondents in all cases. With him on the brief was *Pilar Sokol*.†

---

†Briefs of *amici curiae* urging reversal in No. 93–517 were filed for the Archdiocese of New York by *Richard J. Concannon*; for the American Center for Law and Justice et al. by *Jay Alan Sekulow, James Matthew Henderson, Sr., Mark N. Troobnick, Keith A. Fournier, Nancy J. Gannon*, and *Robert A. Destro*; for the Christian Legal Society et al. by *Michael W. McConnell, Thomas C. Berg*, and *Steven T. McFarland*; and for the Knights of Columbus by *William P. Barr, Michael A. Carvin*, and *Carl A. Anderson*.

Briefs of *amici curiae* urging reversal in all cases were filed for Agudath Israel of America by *David Zwiebel*; for the Institute for Religion and Polity by *Ronald D. Maines*; for the National Jewish Commission on Law and Public Affairs (COLPA) by *Julius Berman* and *Dennis Rapps*; for the Southern Baptist Convention by *Michael K. Whitehead*; and for the United States Catholic Conference by *Mark E. Chopko* and *Phillip H. Harris*.

Briefs of *amici curiae* urging affirmance in all cases were filed for the American Jewish Congress et al. by *Norman Redlich, Marc D. Stern*, and *Elliot Mincberg*; for Americans United for Separation of Church and State et al. by *Steven K. Green, Steven R. Shapiro, Jeffrey P. Sinensky, Steven*

JUSTICE SOUTER delivered the opinion of the Court, except as to Parts II (introduction) and II–A.

The village of Kiryas Joel in Orange County, New York, is a religious enclave of Satmar Hasidim, practitioners of a strict form of Judaism.  The village fell within the Monroe-Woodbury Central School District until a special state statute passed in 1989 carved out a separate district, following village lines, to serve this distinctive population.  1989 N. Y. Laws, ch. 748.  The question is whether the Act creating the separate school district violates the Establishment Clause of the First Amendment, binding on the States through the Fourteenth Amendment.  Because this unusual Act is tantamount to an allocation of political power on a religious criterion and neither presupposes nor requires governmental impartiality toward religion, we hold that it violates the prohibition against establishment.

## I

The Satmar Hasidic sect takes its name from the town near the Hungarian and Romanian border where, in the early years of this century, Grand Rebbe Joel Teitelbaum molded the group into a distinct community.  After World War II and the destruction of much of European Jewry, the Grand

M. Freeman, and Samuel Rabinove; for the Committee for the Well-Being of Kiryas Joel by Joan E. Goldberg and Michael H. Sussman; for the General Council on Finance and Administration of the United Methodist Church by Samuel W. Witwer, Jr.; for the National Coalition for Public Education and Religious Liberty et al. by David B. Isbell; for the National Council of Churches of Christ in the U. S. A. et al. by Douglas Laycock; for the National School Boards Association by Gwendolyn H. Gregory, August W. Steinhilber, and Thomas A. Shannon; for the New York State United Teachers et al. by Bernard F. Ashe and Gerard John De Wolf; and for the Council on Religious Freedom by Lee Boothby, Walter E. Carson, and Robert W. Nixon.

Briefs of amici curiae in all cases were filed for the New York Committee for Public Education and Religious Liberty by Stanley Geller; and for the Rutherford Institute by John W. Whitehead and James J. Knicely.

Rebbe and most of his surviving followers moved to the Williamsburg section of Brooklyn, New York. Then, 20 years ago, the Satmars purchased an approved but undeveloped subdivision in the town of Monroe and began assembling the community that has since become the village of Kiryas Joel. When a zoning dispute arose in the course of settlement, the Satmars presented the Town Board of Monroe with a petition to form a new village within the town, a right that New York's Village Law gives almost any group of residents who satisfy certain procedural niceties. See N. Y. Village Law, Art. 2 (McKinney 1973 and Supp. 1994). Neighbors who did not wish to secede with the Satmars objected strenuously, and after arduous negotiations the proposed boundaries of the village of Kiryas Joel were drawn to include just the 320 acres owned and inhabited entirely by Satmars. The village, incorporated in 1977, has a population of about 8,500 today. Rabbi Aaron Teitelbaum, eldest son of the current Grand Rebbe, serves as the village rov (chief rabbi) and rosh yeshivah (chief authority in the parochial schools).

The residents of Kiryas Joel are vigorously religious people who make few concessions to the modern world and go to great lengths to avoid assimilation into it. They interpret the Torah strictly; segregate the sexes outside the home; speak Yiddish as their primary language; eschew television, radio, and English-language publications; and dress in distinctive ways that include headcoverings and special garments for boys and modest dresses for girls. Children are educated in private religious schools, most boys at the United Talmudic Academy where they receive a thorough grounding in the Torah and limited exposure to secular subjects, and most girls at Bais Rochel, an affiliated school with a curriculum designed to prepare girls for their roles as wives and mothers. See generally W. Kephart & W. Zellner, Extraordinary Groups (4th ed. 1991); I. Rubin, Satmar, An Island in the City (1972).

These schools do not, however, offer any distinctive services to handicapped children, who are entitled under state and federal law to special education services even when enrolled in private schools. Individuals with Disabilities Education Act, 20 U. S. C. § 1400 *et seq.* (1988 ed. and Supp. IV); N. Y. Educ. Law, Art. 89 (McKinney 1981 and Supp. 1994). Starting in 1984 the Monroe-Woodbury Central School District provided such services for the children of Kiryas Joel at an annex to Bais Rochel, but a year later ended that arrangement in response to our decisions in *Aguilar* v. *Felton,* 473 U. S. 402 (1985), and *School Dist. of Grand Rapids* v. *Ball,* 473 U. S. 373 (1985). Children from Kiryas Joel who needed special education (including the deaf, the mentally retarded, and others suffering from a range of physical, mental, or emotional disorders) were then forced to attend public schools outside the village, which their families found highly unsatisfactory. Parents of most of these children withdrew them from the Monroe-Woodbury secular schools, citing "the panic, fear and trauma [the children] suffered in leaving their own community and being with people whose ways were so different," and some sought administrative review of the public-school placements. *Board of Ed. of Monroe-Woodbury Central School Dist.* v. *Wieder,* 72 N. Y. 2d 174, 180–181, 527 N. E. 2d 767, 770 (1988).

Monroe-Woodbury, for its part, sought a declaratory judgment in state court that New York law barred the district from providing special education services outside the district's regular public schools. *Id.,* at 180, 527 N. E. 2d, at 770. The New York Court of Appeals disagreed, holding that state law left Monroe-Woodbury free to establish a separate school in the village because it gives educational authorities broad discretion in fashioning an appropriate program. *Id.,* at 186–187, 527 N. E. 2d, at 773. The court added, however, that the Satmars' constitutional right to exercise their religion freely did not require a separate school, since the parents had alleged emotional trauma, not inconsistency

with religious practice or doctrine, as the reason for seeking separate treatment. *Id.*, at 189, 527 N. E. 2d, at 775.

By 1989, only one child from Kiryas Joel was attending Monroe-Woodbury's public schools; the village's other handicapped children received privately funded special services or went without. It was then that the New York Legislature passed the statute at issue in this litigation, which provided that the village of Kiryas Joel "is constituted a separate school district, . . . and shall have and enjoy all the powers and duties of a union free school district . . . ." 1989 N. Y. Laws, ch. 748.[1] The statute thus empowered a locally elected board of education to take such action as opening schools and closing them, hiring teachers, prescribing textbooks, establishing disciplinary rules, and raising property taxes to fund operations. N. Y. Educ. Law § 1709 (McKinney 1988). In signing the bill into law, Governor Cuomo recognized that the residents of the new school district were "all members of the same religious sect," but said that the bill was "a good faith effort to solve th[e] unique problem" associated with providing special education services to handicapped children in the village. Memorandum filed with Assembly Bill Number 8747 (July 24, 1989), App. 40–41.

Although it enjoys plenary legal authority over the elementary and secondary education of all school-aged children

---

[1] The statute provides in full:

"Section 1. The territory of the village of Kiryas Joel in the town of Monroe, Orange county, on the date when this act shall take effect, shall be and hereby is constituted a separate school district, and shall be known as the Kiryas Joel village school district and shall have and enjoy all the powers and duties of a union free school district under the provisions of the education law.

"§ 2. Such district shall be under the control of a board of education, which shall be composed of from five to nine members elected by the qualified voters of the village of Kiryas Joel, said members to serve for terms not exceeding five years.

"§ 3. This act shall take effect on the first day of July next succeeding the date on which it shall have become a law."

in the village, N. Y. Educ. Law § 3202 (McKinney 1981 and Supp. 1994), the Kiryas Joel Village School District currently runs only a special education program for handicapped children. The other village children have stayed in their parochial schools, relying on the new school district only for transportation, remedial education, and health and welfare services. If any child without a handicap in Kiryas Joel were to seek a public-school education, the district would pay tuition to send the child into Monroe-Woodbury or another school district nearby. Under like arrangements, several of the neighboring districts send their handicapped Hasidic children into Kiryas Joel, so that two thirds of the full-time students in the village's public school come from outside. In all, the new district serves just over 40 full-time students, and two or three times that many parochial school students on a part-time basis.

Several months before the new district began operations, the New York State School Boards Association and respondents Grumet and Hawk brought this action against the State Education Department and various state officials, challenging Chapter 748 under the National and State Constitutions as an unconstitutional establishment of religion.[2] The State Supreme Court for Albany County allowed the Kiryas Joel Village School District and the Monroe-Woodbury Central School District to intervene as parties defendant and accepted the parties' stipulation discontinuing the action against the original state defendants, although the attorney general of New York continued to appear to defend the constitutionality of the statute. See N. Y. Exec. Law § 71 (Mc-

---

[2] Messrs. Grumet and Hawk sued in both their individual capacities and as officers of the State School Boards Association, but New York's Appellate Division ruled that the Association and its officers lacked standing to challenge the constitutionality of Chapter 748. 187 App. Div. 2d 16, 19, 592 N. Y. S. 2d 123, 126 (1992). Thus, as the case comes to us, respondents are simply citizen taxpayers. See N. Y. State Fin. Law § 123 (McKinney 1989).

Kinney 1993). On cross-motions for summary judgment, the trial court ruled for the plaintiffs (respondents here), finding that the statute failed all three prongs of the test in *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971), and was thus unconstitutional under both the National and State Constitutions. *Grumet* v. *New York State Ed. Dept.,* 151 Misc. 2d 60, 579 N. Y. S. 2d 1004 (1992).

A divided Appellate Division affirmed on the ground that Chapter 748 had the primary effect of advancing religion, in violation of both constitutions, 187 App. Div. 2d 16, 592 N. Y. S. 2d 123 (1992), and the State Court of Appeals affirmed on the federal question, while expressly reserving the state constitutional issue, 81 N. Y. 2d 518, 618 N. E. 2d 94 (1993). Judge Smith wrote for the court in concluding that because both the district's public-school population and its school board would be exclusively Hasidic, the statute created a "symbolic union of church and State" that was "likely to be perceived by the Satmarer Hasidim as an endorsement of their religious choices, or by nonadherents as a disapproval" of their own. *Id.,* at 529, 618 N. E. 2d, at 100. As a result, said the majority, the statute's primary effect was an impermissible advancement of religious belief. In a concurring opinion, Judge Hancock found the effect purposeful, so that the statute violated the first as well as the second prong of *Lemon.* 81 N. Y. 2d, at 540, 618 N. E. 2d, at 107. Chief Judge Kaye took a different tack, applying the strict scrutiny we have prescribed for statutes singling out a particular religion for special privileges or burdens; she found Chapter 748 invalid as an unnecessarily broad response to a narrow problem, since it creates a full school district instead of simply prescribing a local school for the village's handicapped children. *Id.,* at 532, 618 N. E. 2d, at 102 (concurring opinion). In dissent, Judge Bellacosa objected that the new district was created to enable the village's handicapped children to receive a secular, public-school education; that this was, indeed, its primary effect; and that any attenuated ben-

efit to religion was a reasonable accommodation of both religious and cultural differences. *Id.*, at 550–551, 618 N. E. 2d, at 113.

We stayed the mandate of the Court of Appeals, 509 U. S. 938 (1993), and granted certiorari, 510 U. S. 989 (1993).

## II

"A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion," *Committee for Public Ed. & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 792–793 (1973), favoring neither one religion over others nor religious adherents collectively over nonadherents. See *Epperson* v. *Arkansas*, 393 U. S. 97, 104 (1968). Chapter 748, the statute creating the Kiryas Joel Village School District, departs from this constitutional command by delegating the State's discretionary authority over public schools to a group defined by its character as a religious community, in a legal and historical context that gives no assurance that governmental power has been or will be exercised neutrally.

*Larkin* v. *Grendel's Den, Inc.*, 459 U. S. 116 (1982), provides an instructive comparison with the litigation before us. There, the Court was requested to strike down a Massachusetts statute granting religious bodies veto power over applications for liquor licenses. Under the statute, the governing body of any church, synagogue, or school located within 500 feet of an applicant's premises could, simply by submitting written objection, prevent the Alcohol Beverage Control Commission from issuing a license. *Id.*, at 117. In spite of the State's valid interest in protecting churches, schools, and like institutions from "'the hurly-burly' associated with liquor outlets," *id.*, at 123 (internal quotation marks omitted), the Court found that in two respects the statute violated "[t]he wholesome 'neutrality' of which this Court's cases speak," *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 222 (1963). The Act brought about a "'fusion of

governmental and religious functions'" by delegating "important, discretionary governmental powers" to religious bodies, thus impermissibly entangling government and religion. 459 U. S., at 126, 127 (quoting *School Dist. of Abington Township* v. *Schempp, supra,* at 222); see also *Lemon* v. *Kurtzman, supra,* at 613. And it lacked "any 'effective means of guaranteeing' that the delegated power '[would] be used exclusively for secular, neutral, and nonideological purposes,'" 459 U. S., at 125 (quoting *Committee for Public Ed. & Religious Liberty* v. *Nyquist, supra,* at 780); this, along with the "significant symbolic benefit to religion" associated with "the mere appearance of a joint exercise of legislative authority by Church and State," led the Court to conclude that the statute had a "'primary' and 'principal' effect of advancing religion," 459 U. S., at 125–126; see also *Lemon* v. *Kurtzman, supra,* at 612. Comparable constitutional problems inhere in the statute before us.

## A

*Larkin* presented an example of united civic and religious authority, an establishment rarely found in such straightforward form in modern America, cf. *Wolman* v. *Walter,* 433 U. S. 229, 263 (1977) (Powell, J., concurring in part, concurring in judgment in part, and dissenting in part), and a violation of "the core rationale underlying the Establishment Clause," 459 U. S., at 126. See also *Allegheny County* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 590–591 (1989) (Establishment Clause prevents delegating governmental power to religious group); *id.,* at 660 (KENNEDY, J., concurring in judgment in part and dissenting in part) (same); *Everson* v. *Board of Ed. of Ewing,* 330 U. S. 1, 15–16 (1947) (Establishment Clause prevents State from "participat[ing] in the affairs of any religious organizations or groups and *vice versa*"); *Torcaso* v. *Watkins,* 367 U. S. 488, 493–494 (1961) (same).

The Establishment Clause problem presented by Chapter 748 is more subtle, but it resembles the issue raised in *Larkin* to the extent that the earlier case teaches that a State may not delegate its civic authority to a group chosen according to a religious criterion. Authority over public schools belongs to the State, N. Y. Const., Art. XI, § 1, and cannot be delegated to a local school district defined by the State in order to grant political control to a religious group. What makes this litigation different from *Larkin* is the delegation here of civic power to the "qualified voters of the village of Kiryas Joel," 1989 N. Y. Laws, ch. 748, as distinct from a religious leader such as the village rov, or an institution of religious government like the formally constituted parish council in *Larkin*. In light of the circumstances of these cases, however, this distinction turns out to lack constitutional significance.

It is, first, not dispositive that the recipients of state power in these cases are a group of religious individuals united by common doctrine, not the group's leaders or officers. Although some school district franchise is common to all voters, the State's manipulation of the franchise for this district limited it to Satmars, giving the sect exclusive control of the political subdivision. In the circumstances of these cases, the difference between thus vesting state power in the members of a religious group as such instead of the officers of its sectarian organization is one of form, not substance. It is true that religious people (or groups of religious people) cannot be denied the opportunity to exercise the rights of citizens simply because of their religious affiliations or commitments, for such a disability would violate the right to religious free exercise, see *McDaniel* v. *Paty*, 435 U. S. 618 (1978), which the First Amendment guarantees as certainly as it bars any establishment. But *McDaniel*, which held that a religious individual could not, because of his religious activities, be denied the right to hold political office, is not in point here. That individuals who happen to be religious

may hold public office does not mean that a State may deliberately delegate discretionary power to an individual, institution, or community on the ground of religious identity. If New York were to delegate civic authority to "the Grand Rebbe," *Larkin* would obviously require invalidation (even though under *McDaniel* the Grand Rebbe may run for, and serve on, his local school board), and the same is true if New York delegates political authority by reference to religious belief. Where "fusion" is an issue, the difference lies in the distinction between a government's purposeful delegation on the basis of religion and a delegation on principles neutral to religion, to individuals whose religious identities are incidental to their receipt of civic authority.

Of course, Chapter 748 delegates power not by express reference to the religious belief of the Satmar community, but to residents of the "territory of the village of Kiryas Joel." 1989 N. Y. Laws, ch. 748. Thus the second (and arguably more important) distinction between these cases and *Larkin* is the identification here of the group to exercise civil authority in terms not expressly religious. But our analysis does not end with the text of the statute at issue, see *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520, 534 (1993); *Wallace* v. *Jaffree,* 472 U. S. 38, 56–61 (1985); *Gomillion* v. *Lightfoot,* 364 U. S. 339, 341–342 (1960), and the context here persuades us that Chapter 748 effectively identifies these recipients of governmental authority by reference to doctrinal adherence, even though it does not do so expressly. We find this to be the better view of the facts because of the way the boundary lines of the school district divide residents according to religious affiliation, under the terms of an unusual and special legislative Act.

It is undisputed that those who negotiated the village boundaries when applying the general village incorporation statute drew them so as to exclude all but Satmars, and that the New York Legislature was well aware that the village remained exclusively Satmar in 1989 when it adopted Chap-

ter 748.   See Brief for Petitioner in No. 93–517, p. 20; Brief for Respondents 11.   The significance of this fact to the state legislature is indicated by the further fact that carving out the village school district ran counter to customary districting practices in the State.   Indeed, the trend in New York is not toward dividing school districts but toward consolidating them.   The thousands of small common school districts laid out in the early 19th century have been combined and recombined, first into union free school districts and then into larger central school districts, until only a tenth as many remain today.   Univ. of State of N. Y. and State Education Dept., School District Reorganization, Law Pamphlet 14, pp. 8–12 (1962) (hereinafter Law Pamphlet); Woodward, N. Y. State Education Dept., Legal and Organizational History of School District Reorganization in New York State 10–11 (Aug. 1986).   Most of these cover several towns, many of them cross county boundaries, and only one remains precisely coterminous with an incorporated village.   Law Pamphlet, at 24.   The object of the State's practice of consolidation is the creation of districts large enough to provide a comprehensive education at affordable cost, which is thought to require at least 500 pupils for a combined junior-senior high school.   Univ. of State of N. Y. and State Education Dept., Master Plan for School District Reorganization in New York State 10–11 (rev. ed. 1958).[3]   The Kiryas Joel Village School District, in contrast, has only 13 local, full-time students in all (even including out-of-area and part-time students leaves the number under 200), and in offering only special education and remedial programs it makes no pretense to be a full-service district.

The origin of the district in a special Act of the legislature, rather than the State's general laws governing school district

---

[3] The Commissioner of Education updates this Master Plan as school districts consolidate, see N. Y. Educ. Law § 314 (McKinney 1988), but has not published a superseding version.

reorganization,[4] is likewise anomalous. Although the legislature has established some 20 existing school districts by special Act, all but one of these are districts in name only, having been designed to be run by private organizations serving institutionalized children. They have neither tax bases nor student populations of their own but serve children placed by other school districts or public agencies. See N. Y. Educ. Law § 3601-a (Statutory Notes), §§ 4001 and 4005 (McKinney Supp. 1994); Law Pamphlet, at 18 ("These districts are school districts only by way of a legal fiction"). The one school district petitioners point to that was formed by special Act of the legislature to serve a whole community, as this one was, is a district formed for a new town, much larger and more heterogeneous than this village, being built on land that straddled two existing districts. See 1972 N. Y. Laws, ch. 928 (authorizing Gananda School District). Thus the Kiryas Joel Village School District is exceptional to the point of singularity, as the only district coming to our notice that the legislature carved from a single existing district to serve local residents. Clearly this district "cannot be seen as the fulfillment of [a village's] destiny as an independent governmental entity," *United States* v. *Scotland Neck City Bd. of Ed.*, 407 U. S. 484, 492 (1972) (Burger, C. J., concurring in result).[5]

---

[4] State law allows consolidation on the initiative of a district superintendent, N. Y. Educ. Law § 1504 (McKinney 1988), local voters, §§ 1510–1513, 1522–1524, 1902, or the Commissioner of Education, §§ 1526, 1801–1803-a, depending on the circumstances. It also authorizes the district superintendent to "organize a new school district," § 1504, which may allow secession from an existing district, but this general law played no part in the creation of the Kiryas Joel Village School District.

[5] Although not dispositive in this facial challenge, the pattern of interdistrict transfers, proposed and presently occurring, tends to confirm that religion rather than geography is the organizing principle for this district. Cf. *United States* v. *Scotland Neck City Bd. of Ed.*, 407 U. S., at 490 (Burger, C. J., concurring in result). When Chapter 748 was passed, the

Because the district's creation ran uniquely counter to state practice, following the lines of a religious community where the customary and neutral principles would not have dictated the same result, we have good reasons to treat this district as the reflection of a religious criterion for identifying the recipients of civil authority. Not even the special needs of the children in this community can explain the legislature's unusual Act, for the State could have responded to the concerns of the Satmar parents without implicating the Establishment Clause, as we explain in some detail further on. We therefore find the legislature's Act to be substantially equivalent to defining a political subdivision and hence the qualification for its franchise by a religious test, resulting in a purposeful and forbidden "fusion of governmental and religious functions." *Larkin* v. *Grendel's Den*, 459 U. S., at 126 (internal quotation marks and citation omitted).[6]

## B

The fact that this school district was created by a special and unusual Act of the legislature also gives reason for concern whether the benefit received by the Satmar community is one that the legislature will provide equally to other religious (and nonreligious) groups. This is the second malady

understanding was that if a non-Hasidic child were to move into the village, the district would pay tuition to send the child to one of the neighboring school districts, since Kiryas Joel would have no regular education program. Although the need for such a transfer has not yet arisen, there are 20 Hasidic children with handicapping conditions who transfer into Kiryas Joel's school district from the nearby East Ramapo and Monroe-Woodbury school districts.

[6] Because it is the unusual circumstances of this district's creation that persuade us the State has employed a religious criterion for delegating political power, this conclusion does not imply that any political subdivision that is coterminous with the boundaries of a religiously homogeneous community suffers the same constitutional infirmity. The district in these cases is distinguishable from one whose boundaries are derived according to neutral historical and geographic criteria, but whose population happens to comprise coreligionists.

the *Larkin* Court identified in the law before it, the absence of an "effective means of guaranteeing" that governmental power will be and has been neutrally employed. *Id.*, at 125 (internal quotation marks and citation omitted). But whereas in *Larkin* it was religious groups the Court thought might exercise civic power to advance the interests of religion (or religious adherents), here the threat to neutrality occurs at an antecedent stage.

The fundamental source of constitutional concern here is that the legislature itself may fail to exercise governmental authority in a religiously neutral way. The anomalously case-specific nature of the legislature's exercise of state authority in creating this district for a religious community leaves the Court without any direct way to review such state action for the purpose of safeguarding a principle at the heart of the Establishment Clause, that government should not prefer one religion to another, or religion to irreligion. See *Wallace* v. *Jaffree*, 472 U. S., at 52–54; *Epperson* v. *Arkansas*, 393 U. S., at 104; *School Dist. of Abington Township* v. *Schempp*, 374 U. S., at 216–217. Because the religious community of Kiryas Joel did not receive its new governmental authority simply as one of many communities eligible for equal treatment under a general law,[7] we have no assurance that the next similarly situated group seeking a school district of its own will receive one; unlike an administrative agency's denial of an exemption from a generally applicable law, which "would be entitled to a judicial audience," *Olsen* v. *Drug Enforcement Admin.*, 878 F. 2d 1458, 1461 (CADC 1989) (R. B. Ginsburg, J.), a legislature's failure to enact a special law is itself unreviewable. Nor can the historical context in these cases furnish us with any reason to suppose that the Satmars are merely one in a series of communities

---

[7] This contrasts with the process by which the village of Kiryas Joel itself was created, involving, as it did, the application of a neutral state law designed to give almost any group of residents the right to incorporate. See *supra*, at 691.

receiving the benefit of special school district laws. Early on in the development of public education in New York, the State rejected highly localized school districts for New York City when they were promoted as a way to allow separate schooling for Roman Catholic children. R. Church & M. Sedlak, Education in the United States 162, 167–169 (1976). And in more recent history, the special Act in these cases stands alone. See *supra*, at 701.

The general principle that civil power must be exercised in a manner neutral to religion is one the *Larkin* Court recognized, although it did not discuss the specific possibility of legislative favoritism along religious lines because the statute before it delegated state authority to any religious group assembled near the premises of an applicant for a liquor license, see 459 U. S., at 120–121, n. 3, as well as to a further category of institutions not identified by religion. But the principle is well grounded in our case law, as we have frequently relied explicitly on the general availability of any benefit provided religious groups or individuals in turning aside Establishment Clause challenges. In *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 673 (1970), for example, the Court sustained a property tax exemption for religious properties in part because the State had "not singled out one particular church or religious group or even churches as such," but had exempted "a broad class of property owned by nonprofit, quasi-public corporations." Accord, *id.*, at 696–697 (opinion of Harlan, J.). And *Bowen* v. *Kendrick*, 487 U. S. 589, 608 (1988), upheld a statute enlisting a "wide spectrum of organizations" in addressing adolescent sexuality because the law was "neutral with respect to the grantee's status as a sectarian or purely secular institution."[8] See also *Texas Monthly, Inc.* v. *Bullock*, 489 U. S.

---

[8] The Court used "sectarian" to refer to organizations akin to this school district in that they were operated in a secular manner but had a religious affiliation; it recognized that government aid may not flow to an institution "'in which religion is so pervasive that a substantial portion of its func-

1 (1989) (striking down sales tax exemption exclusively for religious publications); *id.*, at 14–15 (plurality opinion); *id.*, at 27–28 (BLACKMUN, J., concurring in judgment); *Estate of Thornton* v. *Caldor, Inc.*, 472 U. S. 703, 711 (1985) (O'CONNOR, J., concurring in judgment) (statute impermissibly "singles out Sabbath observers for special . . . protection without according similar accommodation to ethical and religious beliefs and practices of other private employees"); cf. *Witters* v. *Washington Dept. of Servs. for Blind*, 474 U. S. 481, 492 (1986) (Powell, J., concurring).  Here the benefit flows only to a single sect, but aiding this single, small religious group causes no less a constitutional problem than would follow from aiding a sect with more members or religion as a whole, see *Larson* v. *Valente*, 456 U. S. 228, 244–246 (1982), and we are forced to conclude that the State of New York has violated the Establishment Clause.

## C

In finding that Chapter 748 violates the requirement of governmental neutrality by extending the benefit of a special franchise, we do not deny that the Constitution allows the State to accommodate religious needs by alleviating special burdens.  Our cases leave no doubt that in commanding neutrality the Religion Clauses do not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice. Rather, there is "ample room under the Establishment Clause for 'benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference,'" *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos*, 483 U. S. 327, 334 (1987) (quoting *Walz* v. *Tax Comm'n, supra*, at 673); "government may (and sometimes must) accommodate religious practices and . . . may do so without violating the Establishment

tions are subsumed in the religious mission,'" 487 U. S., at 610 (quoting *Hunt* v. *McNair*, 413 U. S. 734, 743 (1973)).

Clause." *Hobbie* v. *Unemployment Appeals Comm'n of Fla.*, 480 U. S. 136, 144–145 (1987). The fact that Chapter 748 facilitates the practice of religion is not what renders it an unconstitutional establishment. Cf. *Lee* v. *Weisman*, 505 U. S. 577, 627 (1992) (SOUTER, J., concurring) ("That government must remain neutral in matters of religion does not foreclose it from ever taking religion into account"); *School Dist. of Abington Township* v. *Schempp*, 374 U. S., at 299 (Brennan, J., concurring) ("[H]ostility, not neutrality, would characterize the refusal to provide chaplains and places of worship for prisoners and soldiers cut off by the State from all civilian opportunities for public communion").

But accommodation is not a principle without limits, and what petitioners seek is an adjustment to the Satmars' religiously grounded preferences[9] that our cases do not countenance. Prior decisions have allowed religious communities and institutions to pursue their own interests free from governmental interference, see *Corporation of Presiding Bishop* v. *Amos, supra*, at 336–337 (government may allow religious organizations to favor their own adherents in hiring, even for secular employment); *Zorach* v. *Clauson*, 343 U. S. 306 (1952) (government may allow public schools to release students during the schoolday to receive off-site religious education), but we have never hinted that an otherwise unconstitutional delegation of political power to a religious group could be saved as a religious accommodation. Petitioners' proposed accommodation singles out a particular religious sect for special treatment,[10] and whatever the limits of permissible legislative accommodations may be, compare

---

[9] The Board of Education of the Kiryas Joel Village School District explains that the Satmars prefer to live together "to facilitate individual religious observance and maintain social, cultural and religious values," but that it is not "'against their religion' to interact with others." Brief for Petitioner in No. 93–517, p. 4, n. 1.

[10] In this respect, it goes beyond even *Larkin*, transferring political authority to a single religious group rather than to any church or school.

*Texas Monthly, Inc.* v. *Bullock, supra* (striking down law exempting only religious publications from taxation), with *Corporation of Presiding Bishop* v. *Amos, supra* (upholding law exempting religious employers from Title VII), it is clear that neutrality as among religions must be honored. See *Larson* v. *Valente, supra*, at 244–246.

This conclusion does not, however, bring the Satmar parents, the Monroe-Woodbury school district, or the State of New York to the end of the road in seeking ways to respond to the parents' concerns. Just as the Court in *Larkin* observed that the State's interest in protecting religious meeting places could be "readily accomplished by other means," 459 U. S., at 124, there are several alternatives here for providing bilingual and bicultural special education to Satmar children. Such services can perfectly well be offered to village children through the Monroe-Woodbury Central School District. Since the Satmars do not claim that separatism is religiously mandated, their children may receive bilingual and bicultural instruction at a public school already run by the Monroe-Woodbury district. Or if the educationally appropriate offering by Monroe-Woodbury should turn out to be a separate program of bilingual and bicultural education at a neutral site near one of the village's parochial schools, this Court has already made it clear that no Establishment Clause difficulty would inhere in such a scheme, administered in accordance with neutral principles that would not necessarily confine special treatment to Satmars. See *Wolman* v. *Walter*, 433 U. S., at 247–248.

To be sure, the parties disagree on whether the services Monroe-Woodbury actually provided in the late 1980's were appropriately tailored to the needs of Satmar children, but this dispute is of only limited relevance to the question whether such services could have been provided, had adjustments been made. As we understand New York law, parents who are dissatisfied with their handicapped child's program have recourse through administrative review pro-

ceedings (a process that appears not to have run its course prior to resort to Chapter 748, see *Board of Ed. of Monroe-Woodbury Central School Dist.* v. *Wieder,* 72 N. Y. 2d, at 180, 527 N. E. 2d, at 770), and if the New York Legislature should remain dissatisfied with the responsiveness of the local school district, it could certainly enact general legislation tightening the mandate to school districts on matters of special education or bilingual and bicultural offerings.

## III

Justice Cardozo once cast the dissenter as "the gladiator making a last stand against the lions." B. Cardozo, Law and Literature 34 (1931). JUSTICE SCALIA's dissent is certainly the work of a gladiator, but he thrusts at lions of his own imagining. We do not disable a religiously homogeneous group from exercising political power conferred on it without regard to religion. Cf. *post,* at 735–736. Unlike the States of Utah and New Mexico (which were laid out according to traditional political methodologies taking account of lines of latitude and longitude and topographical features, see U. S. Dept. of Interior, F. Van Zandt, Boundaries of the United States and the Several States 250–257 (Geological Survey Bulletin 1212, 1966)), the reference line chosen for the Kiryas Joel Village School District was one purposely drawn to separate Satmars from non-Satmars. Nor do we impugn the motives of the New York Legislature, cf. *post,* at 737–740, which no doubt intended to accommodate the Satmar community without violating the Establishment Clause; we simply refuse to ignore that the method it chose is one that aids a particular religious community, as such, see App. 19–20 (Assembly sponsor thrice describes the Act's beneficiaries as the "Hasidic" children or community), rather than all groups similarly interested in separate schooling. The dissent protests it is novel to insist " 'up front' " that a statute not tailor its benefits to apply only to one religious group, *post,* at 747–748, but if this were so, *Texas Monthly, Inc.,* would have

turned out differently, see 489 U. S., at 14–15 (opinion of Brennan, J.); *id.*, at 28 (BLACKMUN, J., concurring in judgment), and language in *Walz* v. *Tax Comm'n of New York City*, 397 U. S., at 673, and *Bowen* v. *Kendrick*, 487 U. S., at 608, purporting to rely on the breadth of the statutory schemes would have been mere surplusage. Indeed, under the dissent's theory, if New York were to pass a law providing school buses only for children attending Christian day schools, we would be constrained to uphold the statute against Establishment Clause attack until faced by a request from a non-Christian family for equal treatment under the patently unequal law. Cf. *Everson* v. *Board of Ed. of Ewing*, 330 U. S., at 17 (upholding school bus service provided all pupils). And to end on the point with which JUSTICE SCALIA begins, the license he takes in suggesting that the Court holds the Satmar sect to be New York's established church, see *post*, at 732, is only one symptom of his inability to accept the fact that this Court has long held that the First Amendment reaches more than classic, 18th-century establishments. See *Torcaso* v. *Watkins*, 367 U. S., at 492–495.

Our job, of course, would be easier if the dissent's position had prevailed with the Framers and with this Court over the years. An Establishment Clause diminished to the dimensions acceptable to JUSTICE SCALIA could be enforced by a few simple rules, and our docket would never see cases requiring the application of a principle like neutrality toward religion as well as among religious sects. But that would be as blind to history as to precedent, and the difference between JUSTICE SCALIA and the Court accordingly turns on the Court's recognition that the Establishment Clause does comprehend such a principle and obligates courts to exercise the judgment necessary to apply it.

In these cases we are clearly constrained to conclude that the statute before us fails the test of neutrality. It delegates a power this Court has said "ranks at the very apex of

the function of a State," *Wisconsin* v. *Yoder,* 406 U. S. 205, 213 (1972), to an electorate defined by common religious belief and practice, in a manner that fails to foreclose religious favoritism. It therefore crosses the line from permissible accommodation to impermissible establishment. The judgment of the Court of Appeals of the State of New York is accordingly

*Affirmed.*

JUSTICE BLACKMUN, concurring.

For the reasons stated by JUSTICE SOUTER and JUSTICE STEVENS, whose opinions I join, I agree that the New York statute under review violates the Establishment Clause of the First Amendment. I write separately only to note my disagreement with any suggestion that today's decision signals a departure from the principles described in *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971). The opinion of the Court (and of the plurality with respect to Part II–A) relies upon several decisions, including *Larkin* v. *Grendel's Den, Inc.,* 459 U. S. 116 (1982), that explicitly rested on the criteria set forth in *Lemon.* Indeed, the two principles on which the opinion bases its conclusion that the legislative Act is constitutionally invalid essentially are the second and third *Lemon* criteria. See *ante,* at 697; *Larkin,* 459 U. S., at 126–127 (finding " 'a fusion of governmental and religious functions' " under *Lemon*'s "entanglement" prong); 459 U. S., at 125–126 (finding a lack of any " 'effective means of guaranteeing' " that governmental power will be neutrally employed under *Lemon*'s " 'principal' or 'primary effect' " prong).

I have no quarrel with the observation of JUSTICE O'CONNOR, *post,* at 718–719, that the application of constitutional principles, including those articulated in *Lemon,* must be sensitive to particular contexts. But I remain convinced of the general validity of the basic principles stated in *Lemon,* which have guided this Court's Establishment Clause deci-

sions in over 30 cases. See *Lee* v. *Weisman*, 505 U. S. 577, 603, n. 4 (1992) (BLACKMUN, J., concurring).

JUSTICE STEVENS, with whom JUSTICE BLACKMUN and JUSTICE GINSBURG join, concurring.

New York created a special school district for the members of the Satmar religious sect in response to parental concern that children suffered "'panic, fear and trauma'" when "'leaving their own community and being with people whose ways were so different.'" *Ante*, at 692. To meet those concerns, the State could have taken steps to alleviate the children's fear by teaching their schoolmates to be tolerant and respectful of Satmar customs. Action of that kind would raise no constitutional concerns and would further the strong public interest in promoting diversity and understanding in the public schools.

Instead, the State responded with a solution that affirmatively supports a religious sect's interest in segregating itself and preventing its children from associating with their neighbors. The isolation of these children, while it may protect them from "panic, fear and trauma," also unquestionably increased the likelihood that they would remain within the fold, faithful adherents of their parents' religious faith. By creating a school district that is specifically intended to shield children from contact with others who have "different ways," the State provided official support to cement the attachment of young adherents to a particular faith. It is telling, in this regard, that two-thirds of the school's full-time students are Hasidic handicapped children from *outside* the village; the Kiryas Joel school thus serves a population far wider than the village—one defined less by geography than by religion. See *ante*, at 694, 701–702, n. 5.

Affirmative state action in aid of segregation of this character is unlike the evenhanded distribution of a public benefit or service, a "release time" program for public school students involving no public premises or funds, or a decision to

grant an exemption from a burdensome general rule. It is, I believe, fairly characterized as establishing, rather than merely accommodating, religion. For this reason, as well as the reasons set out in JUSTICE SOUTER's opinion, I am persuaded that the New York law at issue in these cases violates the Establishment Clause of the First Amendment.

JUSTICE O'CONNOR, concurring in part and concurring in the judgment.

I

The question at the heart of these cases is: What may the government do, consistently with the Establishment Clause, to accommodate people's religious beliefs? The history of the Satmars in Orange County is especially instructive on this, because they have been involved in at least three accommodation problems, of which these cases are only the most recent.

The first problem related to zoning law, and arose shortly after the Satmars moved to the town of Monroe in the early 1970's. Though the area in which they lived was zoned for single-family homes, the Satmars subdivided their houses into several apartments, apparently in part because of their traditionally close-knit extended family groups. The Satmars also used basements of some of their buildings as schools and synagogues, which according to the town was also a zoning violation. See N. Y. Times, Oct. 17, 1976, section 1, p. 53, col. 1; App. 10–14.

Fortunately for the Satmars, New York state law had a way of accommodating their concerns. New York allows virtually any group of residents to incorporate their own village, with broad powers of self-government. The Satmars followed this course, incorporating their community as the village of Kiryas Joel, and their zoning problems, at least, were solved. *Ante,* at 691.

The Satmars' next need for accommodation arose in the mid-1980's. Satmar education is pervasively religious, and

is provided through entirely private schooling. But though the Satmars could afford to educate most of their children, educating the handicapped is a difficult and expensive business. Moreover, it is a business that the government generally funds, with tax moneys that come from the Satmars as well as from everyone else. In 1984, therefore, the Monroe-Woodbury Central School District began providing handicapped education services to the Satmar children at an annex to the Satmar religious school. The curriculum and the environment of the services were entirely secular. They were the same sort of services available to handicapped students at secular public and private schools throughout the country.

In 1985, however, we held that publicly funded classes on religious school premises violate the Establishment Clause. *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373; *Aguilar* v. *Felton*, 473 U. S. 402. Based on these decisions, the Monroe-Woodbury Central School District stopped providing services at the Kiryas Joel site, and required the Satmar children to attend public schools outside the village. This, however, was not a satisfactory arrangement for the Satmars, in part because the Satmar children had a hard time dealing with immersion in the non-Satmar world. By 1989, only one handicapped Kiryas Joel child was going to the public school—the others were getting either privately funded services or no special education at all. Though the Satmars tried to reach some other arrangement with the Monroe-Woodbury Central School District, the problem was not resolved.

In response to these difficulties came the third accommodation. In 1989, the New York Legislature passed a statute to create a special school district covering only the village of Kiryas Joel. This school district could, of course, only operate secular schools, and the Satmars therefore wanted to use it only to provide education for the handicapped. But because the district provides this education in the village, Satmar children could take advantage of the district's serv-

ices without encountering the problems they faced when they were sent out to Monroe-Woodbury schools. It is the constitutionality of the law creating this district that we are now called on to decide.

## II

The three situations outlined above shed light on an important aspect of accommodation under the First Amendment: Religious needs can be accommodated through laws that are neutral with regard to religion. The Satmars' living arrangements were accommodated by their right—a right shared with all other communities, religious or not, throughout New York—to incorporate themselves as a village. From 1984 to 1985, the Satmar handicapped children's educational needs were accommodated by special education programs like those available to all handicapped children, religious or not. Other examples of such accommodations abound: The Constitution itself, for instance, accommodates the religious desires of those who were opposed to oaths by allowing any officeholder—of any religion, or none—to take either an oath of office or an affirmation. Art. II, § 1, cl. 8; Art. VI, cl. 3; see also Amdt. 4. Likewise, the selective service laws provide exemptions for conscientious objectors whether or not the objection is based on religious beliefs. *Welsh* v. *United States,* 398 U. S. 333, 356 (1970) (Harlan, J., concurring in result).

We have time and again held that the government generally may not treat people differently based on the God or gods they worship, or do not worship. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson* v. *Valente,* 456 U. S. 228, 244 (1982). "Just as we subject to the most exacting scrutiny laws that make classifications based on race . . . so too we strictly scrutinize governmental classifications based on religion." *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872, 886, n. 3 (1990). "[T]he Establishment Clause prohibits

government from abandoning secular purposes . . . to favor the adherents of any sect or religious organization." *Gillette* v. *United States*, 401 U. S. 437, 450 (1971). "Neither [the State nor the Federal Governments] can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." *Torcaso* v. *Watkins*, 367 U. S. 488, 495 (1961) (footnote omitted). See also *Texas Monthly, Inc.* v. *Bullock*, 489 U. S. 1, 8–9 (1989) (plurality opinion); *id.*, at 26, 28–29 (BLACKMUN, J., concurring in judgment); *Welsh, supra,* at 356 (Harlan, J., concurring); *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 696–697 (1970) (opinion of Harlan, J.).

This emphasis on equal treatment is, I think, an eminently sound approach. In my view, the Religion Clauses—the Free Exercise Clause, the Establishment Clause, the Religious Test Clause, Art. VI, cl. 3, and the Equal Protection Clause as applied to religion—all speak with one voice on this point: Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits. As I have previously noted, "the Establishment Clause is infringed when the government makes adherence to religion relevant to a person's standing in the political community." *Wallace* v. *Jaffree*, 472 U. S. 38, 69 (1985) (opinion concurring in judgment).

That the government is acting to accommodate religion should generally not change this analysis. What makes accommodation permissible, even praiseworthy, is not that the government is making life easier for some particular religious group as such. Rather, it is that the government is accommodating a deeply held belief. Accommodations may thus justify treating those who share this belief differently from those who do not; but they do not justify discriminations based on sect. A state law prohibiting the consumption of alcohol may exempt sacramental wines, but it may

not exempt sacramental wine use by Catholics but not by Jews. A draft law may exempt conscientious objectors, but it may not exempt conscientious objectors whose objections are based on theistic belief (such as Quakers) as opposed to nontheistic belief (such as Buddhists) or atheistic belief. See *Welsh*, 398 U. S., at 356 (Harlan, J., concurring in result); see also *id.*, at 335–344 (reaching this result on statutory interpretation grounds); *United States* v. *Seeger*, 380 U. S. 163 (1965) (same). The Constitution permits *"nondiscriminatory* religious-practice exemption[s]," *Smith, supra,* at 890 (emphasis added), not sectarian ones.

## III

I join Parts I, II–B, II–C, and III of the Court's opinion because I think this law, rather than being a general accommodation, singles out a particular religious group for favorable treatment. The Court's analysis of the history of this law and of the surrounding statutory scheme, *ante,* at 699–701, persuades me of this.

On its face, this statute benefits one group—the residents of Kiryas Joel. Because this benefit was given to this group based on its religion, it seems proper to treat it as a legislatively drawn religious classification. I realize this is a close question, because the Satmars may be the only group who currently need this particular accommodation. The legislature may well be acting without any favoritism, so that if another group came to ask for a similar district, the group might get it on the same terms as the Satmars. But the nature of the legislative process makes it impossible to be sure of this. A legislature, unlike the judiciary or many administrative decisionmakers, has no obligation to respond to any group's requests. A group petitioning for a law may never get a definite response, or may get a "no" based not on the merits but on the press of other business or the lack of an influential sponsor. Such a legislative refusal to act would not normally be reviewable by a court. Under these

circumstances, it seems dangerous to validate what appears to me a clear religious preference.

Our invalidation of this statute in no way means that the Satmars' needs cannot be accommodated. There is nothing improper about a legislative intention to accommodate a religious group, so long as it is implemented through generally applicable legislation. New York may, for instance, allow all villages to operate their own school districts. If it does not want to act so broadly, it may set forth neutral criteria that a village must meet to have a school district of its own; these criteria can then be applied by a state agency, and the decision would then be reviewable by the judiciary. A district created under a generally applicable scheme would be acceptable even though it coincides with a village that was consciously created by its voters as an enclave for their religious group. I do not think the Court's opinion holds the contrary.

I also think there is one other accommodation that would be entirely permissible: the 1984 scheme, which was discontinued because of our decision in *Aguilar*. The Religion Clauses prohibit the government from favoring religion, but they provide no warrant for discriminating *against* religion. All handicapped children are entitled by law to government-funded special education. See, *e. g.*, Individuals with Disabilities Education Act, 20 U. S. C. § 1400 *et seq.* If the government provides this education on-site at public schools and at nonsectarian private schools, it is only fair that it provide it on-site at sectarian schools as well.

I thought this to be true in *Aguilar*, see 473 U. S., at 421–431 (dissenting opinion), and I still believe it today. The Establishment Clause does not demand hostility to religion, religious ideas, religious people, or religious schools. Cf. *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384 (1993). It is the Court's insistence on disfavoring religion in *Aguilar* that led New York to favor it here. The Court should, in a proper case, be prepared to reconsider *Aguilar*, in order to bring our Establishment Clause juris-

prudence back to what I think is the proper track—government impartiality, not animosity, toward religion.

## IV

One aspect of the Court's opinion in these cases is worth noting: Like the opinions in two recent cases, *Lee* v. *Weisman*, 505 U. S. 577 (1992); *Zobrest* v. *Catalina Foothills School Dist.*, 509 U. S. 1 (1993), and the case I think is most relevant to these, *Larson* v. *Valente*, 456 U. S. 228 (1982), the Court's opinion does not focus on the Establishment Clause test we set forth in *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971).

It is always appealing to look for a single test, a Grand Unified Theory that would resolve all the cases that may arise under a particular Clause. There is, after all, only one Establishment Clause, one Free Speech Clause, one Fourth Amendment, one Equal Protection Clause. See *Craig* v. *Boren*, 429 U. S. 190, 211 (1976) (STEVENS, J., concurring).

But the same constitutional principle may operate very differently in different contexts. We have, for instance, no one Free Speech Clause test. We have different tests for content-based speech restrictions, for content-neutral speech restrictions, for restrictions imposed by the government acting as employer, for restrictions in nonpublic fora, and so on. This simply reflects the necessary recognition that the interests relevant to the Free Speech Clause inquiry—personal liberty, an informed citizenry, government efficiency, public order, and so on—are present in different degrees in each context.

And setting forth a unitary test for a broad set of cases may sometimes do more harm than good. Any test that must deal with widely disparate situations risks being so vague as to be useless. I suppose one can say that the general test for all free speech cases is "a regulation is valid if the interests asserted by the government are stronger than the interests of the speaker and the listeners," but this would hardly be a serviceable formulation. Similarly,

*Lemon* has, with some justification, been criticized on this score.

Moreover, shoehorning new problems into a test that does not reflect the special concerns raised by those problems tends to deform the language of the test. Relatively simple phrases like "primary effect . . . that neither advances nor inhibits religion" and "'entanglement,'" *Lemon, supra,* at 612–613, acquire more and more complicated definitions which stray ever further from their literal meaning. Distinctions are drawn between statutes whose effect is to advance religion and statutes whose effect is to allow religious organizations to advance religion. See, *e. g., Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U. S. 327, 336–337 (1987); *id.,* at 347 (O'CONNOR, J., concurring in judgment) (discussing this point). Assertions are made that authorizing churches to veto liquor sales in surrounding areas "can be seen as having a 'primary' and 'principal' effect of advancing religion." *Larkin* v. *Grendel's Den, Inc.,* 459 U. S. 116, 125–126 (1982). "[E]ntanglement" is discovered in public employers monitoring the performance of public employees—surely a proper enough function—on parochial school premises, and in the public employees cooperating with the school on class scheduling and other administrative details. *Aguilar* v. *Felton,* 473 U. S., at 413. Alternatives to *Lemon* suffer from a similar failing when they lead us to find "coercive pressure" to pray when a school asks listeners—with no threat of legal sanctions—to stand or remain silent during a graduation prayer. *Lee* v. *Weisman, supra,* at 592. Some of the results and perhaps even some of the reasoning in these cases may have been right. I joined two of the cases cited above, *Larkin* and *Lee,* and continue to believe they were correctly decided. But I think it is more useful to recognize the relevant concerns in each case on their own terms, rather than trying to squeeze them into language that does not really apply to them.

Finally, another danger to keep in mind is that the bad test may drive out the good. Rather than taking the opportunity to derive narrower, more precise tests from the case law, courts tend to continually try to patch up the broad test, making it more and more amorphous and distorted. This, I am afraid, has happened with *Lemon*.

Experience proves that the Establishment Clause, like the Free Speech Clause, cannot easily be reduced to a single test. There are different categories of Establishment Clause cases, which may call for different approaches. Some cases, like these, involve government actions targeted at particular individuals or groups, imposing special duties or giving special benefits. Cases involving government speech on religious topics, see, *e. g., Lee* v. *Weisman, supra; Allegheny County* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573 (1989); *Lynch* v. *Donnelly,* 465 U. S. 668 (1984); *Stone* v. *Graham,* 449 U. S. 39 (1980), seem to me to fall into a different category and to require an analysis focusing on whether the speech endorses or disapproves of religion, rather than on whether the government action is neutral with regard to religion. See *Allegheny County, supra,* at 623–637 (O'CONNOR, J., concurring in part and concurring in judgment).

Another category encompasses cases in which the government must make decisions about matters of religious doctrine and religious law. See *Serbian Eastern Orthodox Diocese for United States and Canada* v. *Milivojevich,* 426 U. S. 696 (1976) (which also did not apply *Lemon*). These cases, which often arise in the application of otherwise neutral property or contract principles to religious institutions, involve complicated questions not present in other situations. See, *e. g.,* 426 U. S., at 721 (looking at some aspects of religious law to determine the structure of the church, but refusing to look further into religious law to resolve the ultimate dispute). Government delegations of power to religious bodies may make up yet another category. As *Larkin* itself

suggested, government impartiality towards religion may not be enough in such situations: A law that bars all alcohol sales within some distance of a church, school, or hospital may be valid, but an equally evenhanded law that gives each institution discretionary power over the sales may not be. *Larkin, supra,* at 123–124. Of course, there may well be additional categories, or more opportune places to draw the lines between the categories.

As the Court's opinion today shows, the slide away from *Lemon*'s unitary approach is well under way. A return to *Lemon,* even if possible, would likely be futile, regardless of where one stands on the substantive Establishment Clause questions. I think a less unitary approach provides a better structure for analysis. If each test covers a narrower and more homogeneous area, the tests may be more precise and therefore easier to apply. There may be more opportunity to pay attention to the specific nuances of each area. There might also be, I hope, more consensus on each of the narrow tests than there has been on a broad test. And abandoning the *Lemon* framework need not mean abandoning some of the insights that the test reflected, nor the insights of the cases that applied it.

Perhaps eventually under this structure we may indeed distill a unified, or at least a more unified, Establishment Clause test from the cases. Cf. *Clark* v. *Community for Creative Non-Violence,* 468 U. S. 288, 298–299 (1984) (uniting two strands of Free Speech Clause doctrine). But it seems to me that the case law will better be able to evolve towards this if it is freed from the *Lemon* test's rigid influence. The hard questions would, of course, still have to be asked; but they will be asked within a more carefully tailored and less distorted framework.

\*     \*     \*

For the reasons stated, I would affirm the judgment of the Court of Appeals of the State of New York.

JUSTICE KENNEDY, concurring in the judgment.

The Court's ruling that the Kiryas Joel Village School District violates the Establishment Clause is in my view correct, but my reservations about what the Court's reasoning implies for religious accommodations in general are sufficient to require a separate writing. As the Court recognizes, a legislative accommodation that discriminates among religions may become an establishment of religion. But the Court's opinion can be interpreted to say that an accommodation for a particular religious group is invalid because of the risk that the legislature will not grant the same accommodation to another religious group suffering some similar burden. This rationale seems to me without grounding in our precedents and a needless restriction upon the legislature's ability to respond to the unique problems of a particular religious group. The real vice of the school district, in my estimation, is that New York created it by drawing political boundaries on the basis of religion. I would decide the issue we confront upon this narrower theory, though in accord with many of the Court's general observations about the State's actions in this litigation.

## I

This is not an action in which the government has granted a benefit to a general class of recipients of which religious groups are just one part. See *Zobrest* v. *Catalina Foothills School Dist.*, 509 U. S. 1 (1993); *Bowen* v. *Kendrick*, 487 U. S. 589 (1988); *Witters* v. *Washington Dept. of Servs. for Blind*, 474 U. S. 481 (1986); *Mueller* v. *Allen*, 463 U. S. 388 (1983). It is rather an action in which the government seeks to alleviate a specific burden on the religious practices of a particular religious group. I agree that a religious accommodation demands careful scrutiny to ensure that it does not so burden nonadherents or discriminate against other religions as to become an establishment. I disagree, however, with the suggestion that the Kiryas Joel Village School District contravenes these basic constitutional commands. But for the

forbidden manner in which the New York Legislature sought to go about it, the State's attempt to accommodate the special needs of the handicapped Satmar children would have been valid.

"Government policies of accommodation, acknowledgment, and support for religion are an accepted part of our political and cultural heritage." *Allegheny County* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 657 (1989) (KENNEDY, J., concurring in judgment in part and dissenting in part). Before the Revolution, colonial governments made a frequent practice of exempting religious objectors from general laws. See McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1466–1473 (1990) (recounting colonial exemptions from oath requirements, compulsory military service, religious assessments, and other general legislation). As early as 1691, for instance, New York allowed Quakers to testify by affirmation rather than oath in civil court cases. T. Curry, The First Freedoms: Church and State in America to the Passage of the First Amendment 64 (1986). Later, during the American Revolution, the Continental Congress exempted religious objectors from military conscription. Resolution of July 18, 1775, reprinted in 2 Journals of the Continental Congress 187, 189 (Library of Congress ed. 1905) ("As there are some people, who, from religious principles, cannot bear arms in any case, this Congress intend no violence to their consciences . . ."). And since the framing of the Constitution, this Court has approved legislative accommodations for a variety of religious practices. See, *e. g.*, *Selective Draft Law Cases*, 245 U. S. 366, 389–390 (1918) (military draft exemption for religious objectors); *Zorach* v. *Clauson*, 343 U. S. 306 (1952) (New York City program permitting public school children to leave school for one hour a week for religious observance and instruction); *Gillette* v. *United States*, 401 U. S. 437 (1971) (military draft exemption for religious objectors); *Corporation of Presiding Bishop of*

*Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U. S. 327 (1987) (exemption of religious organizations from Title VII's prohibition of religious discrimination); *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872, 890 (1990) (exemption from drug laws for sacramental peyote use) (dicta).

New York's object in creating the Kiryas Joel Village School District—to accommodate the religious practices of the handicapped Satmar children—is validated by the principles that emerge from these precedents. First, by creating the district, New York sought to alleviate a specific and identifiable burden on the Satmars' religious practice. The Satmars' way of life, which springs out of their strict religious beliefs, conflicts in many respects with mainstream American culture. They do not watch television or listen to radio; they speak Yiddish in their homes and do not read English-language publications; and they have a distinctive hairstyle and dress. Attending the Monroe-Woodbury public schools, where they were exposed to much different ways of life, caused the handicapped Satmar children understandable anxiety and distress. New York was entitled to relieve these significant burdens, even though mainstream public schooling does not conflict with any specific tenet of the Satmars' religious faith. The Title VII exemption upheld in *Corporation of Presiding Bishop, supra,* for example, covers religious groups who may not believe themselves obliged to employ coreligionists in every instance. See also *Walz* v. *Tax Comm'n of City of New York,* 397 U. S. 664, 673 (1970) ("The limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause"); accord, *Smith, supra,* at 890 (legislatures may grant accommodations even when courts may not).

Second, by creating the district, New York did not impose or increase any burden on non-Satmars, compared to the burden it lifted from the Satmars, that might disqualify the dis-

trict as a genuine accommodation. In *Gillette, supra,* the Court upheld a military draft exemption, even though the burden on those without religious objection to war (the increased chance of being drafted and forced to risk one's life in battle) was substantial. And in *Corporation of Presiding Bishop,* the Court upheld the Title VII exemption even though it permitted employment discrimination against nonpractitioners of the religious organization's faith. There is a point, to be sure, at which an accommodation may impose a burden on nonadherents so great that it becomes an establishment. See, *e. g., Estate of Thornton v. Caldor, Inc.,* 472 U. S. 703, 709–710 (1985) (invalidating mandatory Sabbath day off because it provided "no exception when honoring the dictates of Sabbath observers would cause the employer substantial economic burdens or when the employer's compliance would require the imposition of significant burdens on other employees required to work in place of the Sabbath observers"). This action has not been argued, however, on the theory that non-Satmars suffer any special burdens from the existence of the Kiryas Joel Village School District.

Third, the creation of the school district to alleviate the special burdens born by the handicapped Satmar children cannot be said, for that reason alone, to favor the Satmar religion to the exclusion of any other. "The clearest command of the Establishment Clause," of course, "is that one religious denomination cannot be officially preferred over another." *Larson v. Valente,* 456 U. S. 228, 244 (1982); accord, *Smith, supra,* at 886, n. 3. I disagree, however, with the Court's conclusion that the school district breaches this command. The Court insists that religious favoritism is a danger here, because the "anomalously case-specific nature of the legislature's exercise of state authority in creating this district for a religious community leaves the Court without any direct way to review such state action" to ensure interdenominational neutrality. *Ante,* at 703. "Because the religious community of Kiryas Joel did not receive its new gov-

ernmental authority simply as one of many communities eligible for equal treatment under a general law," the Court maintains, "we have no assurance that the next similarly situated group seeking a school district of its own will receive one; . . . a legislature's failure to enact a special law is itself unreviewable." *Ibid.* (footnote omitted).

This reasoning reverses the usual presumption that a statute is constitutional and, in essence, adjudges the New York Legislature guilty until it proves itself innocent. No party has adduced any evidence that the legislature has denied another religious community like the Satmars its own school district under analogous circumstances. The legislature, like the judiciary, is sworn to uphold the Constitution, and we have no reason to presume that the New York Legislature would not grant the same accommodation in a similar future case. The fact that New York singled out the Satmars for this special treatment indicates nothing other than the uniqueness of the handicapped Satmar children's plight. It is normal for legislatures to respond to problems as they arise—no less so when the issue is religious accommodation. Most accommodations cover particular religious practices. See, *e. g.,* 21 CFR § 1307.31 (1993) ("The listing of peyote as a controlled substance . . . does not apply to the nondrug use of peyote in bona fide religious ceremonies of the Native American Church"); 25 CFR § 11.87H (1993) ("[I]t shall not be unlawful for any member of the Native American Church to transport into Navajo country, buy, sell, possess, or use peyote in any form in connection with the religious practices, sacraments or services of the Native American Church"); Dept. of Air Force, Reg. 35-10, ¶ 2–28(b)(2) (Apr. 1989) ("Religious head coverings are authorized for wear while in uniform when military headgear is not authorized. . . . Religious head coverings may be worn underneath military headgear if they do not interfere with the proper wearing, functioning, or appearance of the prescribed headgear. . . .

For example, Jewish yarmulkes meet this requirement if they do not exceed 6 inches in diameter"); National Prohibition Act, § 3, 41 Stat. 308 ("Liquor for nonbeverage purposes and wine for sacramental purposes may be manufactured, purchased, sold, bartered, transported, imported, exported, delivered, furnished and possessed"), repealed by Liquor Law Repeal and Enforcement Act, § 1, 49 Stat. 872. They do not thereby become invalid.

Nor is it true that New York's failure to accommodate another religious community facing similar burdens would be insulated from challenge in the courts. The burdened community could sue the State of New York, contending that New York's discriminatory treatment of the two religious communities violated the Establishment Clause. To resolve this claim, the court would have only to determine whether the community does indeed bear the same burden on its religious practice as did the Satmars in Kiryas Joel. See *Olsen* v. *Drug Enforcement Admin.*, 878 F. 2d 1458, 1463–1465 (CADC 1989) (R. B. Ginsburg, J.) (rejecting claim that the members of the Ethiopian Zion Coptic Church were entitled to an exemption from the marijuana laws on the same terms as the peyote exemption for the Native American Church); *Olsen* v. *Iowa*, 808 F. 2d 652 (CA8 1986) (same). While a finding of discrimination would then raise a difficult question of relief, compare *Olsen*, 878 F. 2d, at 1464 ("Faced with the choice between invalidation and extension of any controlled-substances religious exemption, which would the political branches choose? It would take a court bolder than this one to predict . . . that extension, not invalidation, would be the probable choice"), with *Califano* v. *Westcott*, 443 U. S. 76, 89–93 (1979) (curing gender discrimination in the Aid to Families with Dependent Children program by extending benefits to children of unemployed mothers instead of denying benefits to children of unemployed fathers), the discrimination itself would not be beyond judicial remedy.

## II

The Kiryas Joel Village School District thus does not suffer any of the typical infirmities that might invalidate an attempted legislative accommodation. In the ordinary case, the fact that New York has chosen to accommodate the burdens unique to one religious group would raise no constitutional problems. Without further evidence that New York has denied the same accommodation to religious groups bearing similar burdens, we could not presume from the particularity of the accommodation that the New York Legislature acted with discriminatory intent.

This particularity takes on a different cast, however, when the accommodation requires the government to draw political or electoral boundaries. "The principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause," *Lee* v. *Weisman*, 505 U. S. 577, 587 (1992), and in my view one such fundamental limitation is that government may not use religion as a criterion to draw political or electoral lines. Whether or not the purpose is accommodation and whether or not the government provides similar gerrymanders to people of all religious faiths, the Establishment Clause forbids the government to use religion as a line-drawing criterion. In this respect, the Establishment Clause mirrors the Equal Protection Clause. Just as the government may not segregate people on account of their race, so too it may not segregate on the basis of religion. The danger of stigma and stirred animosities is no less acute for religious line-drawing than for racial. Justice Douglas put it well in a statement this Court quoted with approval just last Term:

> "When racial or religious lines are drawn by the State, the multiracial, multireligious communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race or to religion

rather than to political issues are generated; communities seek not the best representative but the best racial or religious partisan. Since that system is at war with the democratic ideal, it should find no footing here." *Wright* v. *Rockefeller*, 376 U. S. 52, 67 (1964) (Douglas, J., dissenting) (quoted in *Shaw* v. *Reno*, 509 U. S. 630, 648–649 (1993)).

I agree with the Court insofar as it invalidates the school district for being drawn along religious lines. As the plurality observes, *ante*, at 699–700, the New York Legislature knew that everyone within the village was Satmar when it drew the school district along the village lines, and it determined who was to be included in the district by imposing, in effect, a religious test. There is no serious question that the legislature configured the school district, with purpose and precision, along a religious line. This explicit religious gerrymandering violates the First Amendment Establishment Clause.

It is important to recognize the limits of this principle. We do not confront the constitutionality of the Kiryas Joel village itself, and the formation of the village appears to differ from the formation of the school district in one critical respect. As the Court notes, *ante*, at 703, n. 7, the village was formed pursuant to a religion-neutral self-incorporation scheme. Under New York law, a territory with at least 500 residents and not more than five square miles may be incorporated upon petition by at least 20 percent of the voting residents of that territory or by the owners of more than 50 percent of the territory's real property. N. Y. Village Law §§ 2–200, 2–202 (McKinney 1973 and Supp. 1994). Aside from ensuring that the petition complies with certain procedural requirements, the supervisor of the town in which the territory is located has no discretion to reject the petition. § 2–206; see Decision on Sufficiency of Petition, in App. 8, 14 ("[T]he hollow provisions of the Village Law . . . allow me only to review the procedural niceties of the petition itself").

The residents of the town then vote upon the incorporation petition in a special election. N. Y. Village Law § 2–212 (Mc-Kinney 1973). By contrast, the Kiryas Joel Village School District was created by state legislation. The State of New York had complete discretion not to enact it. The State thus had a direct hand in accomplishing the religious segregation.

As the plurality indicates, the Establishment Clause does not invalidate a town or a State "whose boundaries are derived according to neutral historical and geographic criteria, but whose population happens to comprise coreligionists." *Ante*, at 702, n. 6. People who share a common religious belief or lifestyle may live together without sacrificing the basic rights of self-governance that all American citizens enjoy, so long as they do not use those rights to establish their religious faith. Religion flourishes in community, and the Establishment Clause must not be construed as some sort of homogenizing solvent that forces unconventional religious groups to choose between assimilating to mainstream American culture or losing their political rights. There is more than a fine line, however, between the voluntary association that leads to a political community comprised of people who share a common religious faith, and the forced separation that occurs when the government draws explicit political boundaries on the basis of peoples' faith. In creating the Kiryas Joel Village School District, New York crossed that line, and so we must hold the district invalid.

### III

This is an unusual action, for it is rare to see a State exert such documented care to carve out territory for people of a particular religious faith. It is also unusual in that the problem to which the Kiryas Joel Village School District was addressed is attributable in no small measure to what I believe were unfortunate rulings by this Court.

Before 1985, the handicapped Satmar children of Kiryas Joel attended the private religious schools within the village

that the other Satmar children attended. Because their handicaps were in some cases acute (ranging from mental retardation and deafness to spina bifida and cerebral palsy), the State of New York provided public funds for special education of these children at annexes to the religious schools. Then came the companion cases of *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373 (1985), and *Aguilar* v. *Felton*, 473 U. S. 402 (1985). In *Grand Rapids*, the Court invalidated a program in which public school teachers would offer · supplemental classes at private schools, including religious schools, at the end of the regular schoolday. And in *Aguilar*, the Court invalidated New York City's use of Title I funding to pay the salaries of public school teachers who taught educationally deprived children of low-income families at parochial schools in the city. After these cases, the Monroe-Woodbury Central School District suspended its special education program at the Kiryas Joel religious schools, and the Kiryas Joel parents were forced to enroll their handicapped children at the Monroe-Woodbury public schools in order for the children to receive special education. The ensuing difficulties, as the Court recounts, *ante*, at 692–693, led to the creation of the Kiryas Joel Village School District.

The decisions in *Grand Rapids* and *Aguilar* may have been erroneous. In light of the action before us, and in the interest of sound elaboration of constitutional doctrine, it may be necessary for us to reconsider them at a later date. A neutral aid scheme, available to religious and nonreligious alike, is the preferable way to address problems such as the Satmar handicapped children have suffered. See *Witters*, 474 U. S., at 490–492 (Powell, J., concurring). But for *Grand Rapids* and *Aguilar*, the Satmars would have had no need to seek special accommodations or their own school district. Our decisions led them to choose that unfortunate course, with the deficiencies I have described.

One misjudgment is no excuse, however, for compounding it with another. We must confront this litigation as it comes be-

fore us, without bending rules to free the Satmars from a predicament into which we put them. The Establishment Clause forbids the government to draw political boundaries on the basis of religious faith. For this reason, I concur in the judgment of the Court.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

The Court today finds that the Powers That Be, up in Albany, have conspired to effect an establishment of the Satmar Hasidim. I do not know who would be more surprised at this discovery: the Founders of our Nation or Grand Rebbe Joel Teitelbaum, founder of the Satmar. The Grand Rebbe would be astounded to learn that after escaping brutal persecution and coming to America with the modest hope of religious toleration for their ascetic form of Judaism, the Satmar had become so powerful, so closely allied with Mammon, as to have become an "establishment" of the Empire State. And the Founding Fathers would be astonished to find that the Establishment Clause—which they designed "to insure that no one powerful sect or combination of sects could use political or governmental power to punish dissenters," *Zorach* v. *Clauson*, 343 U. S. 306, 319 (1952) (Black, J., dissenting)—has been employed to prohibit characteristically and admirably American accommodation of the religious practices (or more precisely, cultural peculiarities) of a tiny minority sect. *I*, however, am *not* surprised. Once this Court has abandoned text and history as guides, nothing prevents it from calling religious toleration the establishment of religion.

## I

Unlike most of our Establishment Clause cases involving education, these cases involve no public funding, however slight or indirect, to private religious schools. They do not involve private schools at all. The school under scrutiny is a public school specifically designed to provide a public secular

education to handicapped students. The superintendent of the school, who is not Hasidic, is a 20-year veteran of the New York City public school system, with expertise in the area of bilingual, bicultural, special education. The teachers and therapists at the school all live outside the village of Kiryas Joel. While the village's private schools are profoundly religious and strictly segregated by sex, classes at the public school are co-ed and the curriculum secular. The school building has the bland appearance of a public school, unadorned by religious symbols or markings; and the school complies with the laws and regulations governing all other New York State public schools. There is no suggestion, moreover, that this public school has gone too far in making special adjustments to the religious needs of its students. Cf. *id.*, at 312–315 (approving a program permitting early release of public school students to attend religious instruction). In sum, these cases involve only public aid to a school that is public as can be. The only thing distinctive about the school is that all the students share the same religion.

None of our cases has ever suggested that there is anything wrong with that. In fact, the Court has specifically *approved* the education of students of a single religion on a neutral site adjacent to a private religious school. See *Wolman* v. *Walter*, 433 U. S. 229, 247–248 (1977). In that case, the Court rejected the argument that "any program that isolates the sectarian pupils is impermissible," *id.*, at 246, and held that, "[t]he fact that a unit on a neutral site on occasion may serve only sectarian pupils does not provoke [constitutional] concerns," *id.*, at 247. And just last Term, the Court held that the State could permit public employees to assist students in a Catholic school. See *Zobrest* v. *Catalina Foothills School Dist.*, 509 U. S. 1, 13–14 (1993) (sign-language translator for deaf student). If a State can furnish services to a group of sectarian students on a neutral site adjacent to a private religious school, or even *within* such a school, how can there be any defect in educating those same students in

a public school? As the Court noted in *Wolman*, the constitutional dangers of establishment arise "from the nature of the institution, not from the nature of the pupils," 433 U. S., at 248. There is no danger in educating religious students in a public school.

For these very good reasons, JUSTICE SOUTER's opinion does not focus upon the school, but rather upon the school district and the New York Legislature that created it. His arguments, though sometimes intermingled, are two: that reposing governmental power in the Kiryas Joel school district is the same as reposing governmental power in a religious group; and that in enacting the statute creating the district, the New York State Legislature was discriminating on the basis of religion, *i. e.*, favoring the Satmar Hasidim over others. I shall discuss these arguments in turn.

## II

For his thesis that New York has unconstitutionally conferred governmental authority upon the Satmar sect, JUSTICE SOUTER relies extensively, and virtually exclusively, upon *Larkin* v. *Grendel's Den, Inc.*, 459 U. S. 116 (1982). JUSTICE SOUTER believes that the present litigation "resembles" *Grendel's Den* because that case "teaches that a State may not delegate its civic authority *to a group chosen according to a religious criterion*," *ante*, at 698 (emphasis added). That misdescribes both what that case taught (which is that a State may not delegate its civil authority *to a church*), and what these cases involve (which is a group chosen according to cultural characteristics). The statute at issue there gave churches veto power over the State's authority to grant a liquor license to establishments in the vicinity of the church. The Court had little difficulty finding the statute unconstitutional. "The Framers did not set up a system of government in which important, discretionary governmental powers would be delegated to or shared with religious institutions." 459 U. S., at 127.

JUSTICE SOUTER concedes that *Grendel's Den* "presented an example of united civic and religious authority, an establishment rarely found in such straightforward form in modern America." *Ante*, at 697. The uniqueness of the case stemmed from the grant of governmental power directly to a religious institution, and the Court's opinion focused on that fact, remarking that the transfer of authority was to "churches" (10 times), the "governing body of churches" (twice), "religious institutions" (twice), and "religious bodies" (once). Astonishingly, however, JUSTICE SOUTER dismisses the difference between a transfer of government power to citizens who share a common religion as opposed to "the officers of its sectarian organization"—the critical factor that made *Grendel's Den* unique and "rar[e]"—as being "one of form, not substance." *Ante*, at 698.

JUSTICE SOUTER's steamrolling of the difference between civil authority held by a church and civil authority held by members of a church is breathtaking. To accept it, one must believe that large portions of the civil authority exercised during most of our history were unconstitutional, and that much more of it than merely the Kiryas Joel school district is unconstitutional today. The history of the populating of North America is in no small measure the story of groups of people sharing a common religious and cultural heritage striking out to form their own communities. See, *e. g.*, W. Sweet, The Story of Religion in America 9 (1950). It is preposterous to suggest that the civil institutions of these communities, separate from their churches, were constitutionally suspect. And if they were, surely JUSTICE SOUTER cannot mean that the inclusion of one or two nonbelievers in the community would have been enough to eliminate the constitutional vice. If the conferral of governmental power upon a religious institution *as such* (rather than upon American citizens who belong to the religious institution) is not the test of *Grendel's Den* invalidity, there is no reason why giving power to a body that is overwhelmingly dominated

by the members of one sect would not suffice to invoke the Establishment Clause. That might have made the entire States of Utah and New Mexico unconstitutional at the time of their admission to the Union,[1] and would undoubtedly make many units of local government unconstitutional today.[2]

JUSTICE SOUTER's position boils down to the quite novel proposition that any group of citizens (say, the residents of Kiryas Joel) can be invested with political power, but not if they all belong to the same religion. Of course such *disfavoring* of religion is positively antagonistic to the purposes of the Religion Clauses, and we have rejected it before. In *McDaniel* v. *Paty*, 435 U. S. 618 (1978), we invalidated a state constitutional amendment that would have permitted all persons to participate in political conventions, except ministers. We adopted James Madison's view that the State could not " 'punis[h] a religious profession with the privation of a civil right.' " *Id.*, at 626 (opinion of Burger, C. J.), quoting 5 Writings of James Madison 288 (G. Hunt ed. 1904). Or as Justice

---

[1] A census taken in 1906, 10 years after statehood was granted to Utah, and 6 years before it was granted to New Mexico, showed that in Utah 87.7% of all church members were Mormon, and in New Mexico 88.7% of all church members were Roman Catholic. See Bureau of the Census, Special Reports, Religious Bodies, Part I, p. 55 (1910).

[2] At the county level, the smallest unit for which comprehensive data is available, there are a number of counties in which the overwhelming majority of churchgoers are of a single religion: Rich County, Utah (100% Mormon); Kennedy County, Texas (100% Roman Catholic); Emery County, Utah (99.2% Mormon); Franklin and Madison Counties, Idaho (99% or more Mormon); Graham County, North Carolina (93.7% Southern Baptist); Mora County, New Mexico (92.6% Roman Catholic). M. Bradley, N. Green, D. Jones, M. Lynn, & L. McNeil, Churches and Church Membership in the United States 1990, pp. 46, 112–113, 246, 265, 283, 365, 380, 393 (1992). In all of these counties the adherents of the indicated religion constitute a substantial majority, in some cases over a 95% majority, of the *total* population. If data were available for smaller units of government than counties, I have no doubt I could point to hundreds of towns placed in jeopardy by today's opinion.

Brennan put it in his opinion concurring in judgment: "Religionists no less than members of any other group enjoy the full measure of protection afforded speech, association, and political activity generally." 435 U. S., at 641; see also *Widmar* v. *Vincent*, 454 U. S. 263 (1981). I see no reason why it is any less pernicious to deprive a group rather than an individual of its rights simply because of its religious beliefs.

Perhaps appreciating the startling implications for our constitutional jurisprudence of collapsing the distinction between religious institutions and their members, JUSTICE SOUTER tries to limit his "unconstitutional conferral of civil authority" holding by pointing out several features supposedly unique to the present cases: that the "boundary lines of the school district divide residents *according to* religious affiliation," *ante*, at 699 (emphasis added); that the school district was created by "a special Act of the legislature," *ante*, at 700; and that the formation of the school district ran counter to the legislature's trend of consolidating districts in recent years, *ibid.* Assuming all these points to be true (and they are not), they would certainly bear upon whether the legislature had an impermissible religious motivation in creating the district (which is JUSTICE SOUTER's *next* point, in the discussion of which I shall reply to these arguments). But they have nothing to do with whether conferral of power upon a group of citizens can be the conferral of power upon a religious institution. It cannot. Or if it can, our Establishment Clause jurisprudence has been transformed.

## III

I turn, next, to JUSTICE SOUTER's second justification for finding an establishment of religion: his facile conclusion that the New York Legislature's creation of the Kiryas Joel school district was religiously motivated. But in the Land of the Free, democratically adopted laws are not so easily impeached by unelected judges. To establish the unconstitu-

tionality of a facially neutral law on the mere basis of its asserted religiously preferential (or discriminatory) effects— or at least to establish it in conformity with our precedents— JUSTICE SOUTER "must be able to show the absence of a neutral, secular basis" for the law. *Gillette* v. *United States,* 401 U. S. 437, 452 (1971); see also *Arlington Heights* v. *Metropolitan Housing Development Corp.,* 429 U. S. 252, 266 (1977) (facially race-neutral laws can be invalidated on the basis of their effects only if "unexplainable on grounds other than race").

There is of course no possible doubt of a secular basis here. The New York Legislature faced a unique problem in Kiryas Joel: a community in which all the nonhandicapped children attend private schools, and the physically and mentally disabled children who attend public school suffer the additional handicap of cultural distinctiveness. It would be troublesome enough if these peculiarly dressed, handicapped students were sent to the next town, accompanied by their similarly clad but unimpaired classmates. But all the unimpaired children of Kiryas Joel attend private school. The handicapped children suffered sufficient emotional trauma from their predicament that their parents kept them home from school. Surely the legislature could target this problem, and provide a public education for these students, in the same way it addressed, *by a similar law,* the unique needs of children institutionalized in a hospital. See, *e. g.,* 1970 N. Y. Laws, ch. 843 (authorizing a union free school district for the area owned by Blythedale Children's Hospital).

Since the obvious presence of a neutral, secular basis renders the asserted preferential effect of this law inadequate to invalidate it, JUSTICE SOUTER is required to come forward with direct evidence that religious preference was the objective. His case could scarcely be weaker. It consists, briefly, of this: The People of New York created the Kiryas Joel Village School District in order to further the Satmar religion, rather than for any proper secular purpose, because

(1) they created the district in an extraordinary manner—by special Act of the legislature, rather than under the State's general laws governing school-district reorganization; (2) the creation of the district ran counter to a state trend toward consolidation of school districts; and (3) the district includes only adherents of the Satmar religion. On this indictment, no jury would convict.

One difficulty with the first point is that it is not true. There was really nothing so "special" about the formation of a school district by an Act of the New York Legislature. The State has created both large school districts, see, *e. g.*, 1972 N. Y. Laws, ch. 928 (creating the Gananda School District out of land previously in two other districts), and small specialized school districts for institutionalized children, see, *e. g.*, 1972 N. Y. Laws, ch. 559 (creating a union free school district for the area owned by Abbott House), through these special Acts. But in any event all that the first point proves, and the second point as well (countering the trend toward consolidation),[3] is that New York regarded Kiryas Joel as a

---

[3] The Court says that "[e]arly on in the development of public education in New York, the State rejected highly localized school districts for New York City when they were promoted as a way to allow separate schooling for Roman Catholic children." *Ante*, at 704. Both the implication that this rejection of localism was general state policy, and the implication that (like the Court's prohibition of localism today) it had the purpose and effect of religious neutrality, are simply not faithful to the cited source. The 1841 proposal was not to treat New York City schools *differently*, in order to favor Roman Catholics; it was "that the state's school code, which promoted a district system structure with local taxing authority, be extended to New York City." R. Church & M. Sedlak, Education in the United States 167 (1976). And the rejection of that proposal was not a triumph for keeping sectarian religion out of some public schools; it was a triumph for keeping the King James version of the Bible in all public schools. The Court's selected source concludes: "[T]he Whigs swept the city elections that year [1842] and made Bible reading—the King James version—mandatory in any schools sharing these monies. There was nothing left for the Catholics to do but to build their own parochial system with their own money." *Id.*, at 168–169.

special case, requiring special measures. I should think it *obvious* that it did, and obvious that it *should have*. But even if the New York Legislature had never before created a school district by special statute (which is not true), and even if it had done nothing but consolidate school districts for over a century (which is not true), how could the departure from those past practices possibly demonstrate that the legislature had religious favoritism in mind? It could not. To be sure, when there is no special treatment there is no possibility of religious favoritism; but it is not logical to suggest that when there *is* special treatment there is *proof* of religious favoritism.

JUSTICE SOUTER's case against the statute comes down to nothing more, therefore, than his third point: the fact that all the residents of the Kiryas Joel Village School District are Satmars. But all its residents also wear unusual dress, have unusual civic customs, and have not much to do with people who are culturally different from them. (The Court recognizes that "the Satmars prefer to live together 'to facilitate individual religious observance and maintain social, cultural and religious values,' but that it is not '"against their religion" to interact with others.'" *Ante*, at 706, n. 9, quoting Brief for Petitioners in No. 93–517, p. 4, n. 1.) On what basis does JUSTICE SOUTER conclude that it is the theological distinctiveness rather than the cultural distinctiveness that was the basis for New York State's decision? The normal assumption would be that it was the latter, since it was not theology but dress, language, and cultural alienation that posed the educational problem for the children. JUSTICE SOUTER not only does not adopt the logical assumption, he does not even give the New York Legislature the benefit of the doubt. The following is the level of his analysis:

> "Not even the special needs of the children in this community can explain the legislature's unusual Act, for the State could have responded to the concerns of the Satmar parents [by other means]." *Ante*, at 702.

In other words, we know the legislature must have been motivated by the desire to favor the Satmar Hasidim religion, because it *could* have met the needs of these children by a method that did not place the Satmar Hasidim in a separate school district. This is not a rational argument proving religious favoritism; it is rather a novel Establishment Clause principle to the effect that no secular objective may be pursued by a means that might also be used for religious favoritism if some other means is available.

I have little doubt that JUSTICE SOUTER would laud this humanitarian legislation if all of the distinctiveness of the students of Kiryas Joel were attributable to the fact that their parents were nonreligious commune dwellers, or American Indians, or gypsies. The creation of a special, one-culture school district for the benefit of those children would pose no problem. The neutrality demanded by the Religion Clauses requires the same indulgence towards cultural characteristics that *are* accompanied by religious belief. "The Establishment Clause does not license government to treat religion and those who teach or practice it, simply by virtue of their status as such, as . . . subject to unique disabilities." *McDaniel* v. *Paty*, 435 U. S., at 641 (Brennan, J., concurring in judgment).

Even if JUSTICE SOUTER could successfully establish that the cultural distinctiveness of the Kiryas Joel students (which is the problem the New York Legislature addressed) was an *essential part* of their religious belief rather than merely an *accompaniment* of their religious belief, that would not discharge his heavy burden. In order to invalidate a facially neutral law, JUSTICE SOUTER would have to show not only that legislators were aware that religion caused the problems addressed, but also that the legislature's proposed solution was motivated by a desire to disadvantage or benefit a religious group (*i. e.*, to disadvantage or benefit them *because of their religion*). For example, if the city of Hialeah, knowing of the potential health problems raised by

the Santeria religious practice of animal sacrifice, were to provide by ordinance a special, more frequent, municipal garbage collection for the carcasses of dead animals, we would not strike the ordinance down just because the city council was aware that a religious practice produced the problem the ordinance addressed. See *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520, 543–545 (1993). Here a facially neutral statute extends an educational benefit to the one area where it was not effectively distributed. Whether or not the reason for the ineffective distribution had anything to do with religion, it is a remarkable stretch to say that the Act was motivated by a desire to favor or disfavor a particular religious group. The proper analogy to Chapter 748 is not the Court's hypothetical law providing school buses only to Christian students, see *ante,* at 709, but a law providing extra buses to rural school districts (which happen to be predominantly Southern Baptist).

At various times JUSTICE SOUTER intimates, though he does not precisely say, that the boundaries of the school district were intentionally drawn on the basis of religion. He refers, for example, to "the State's manipulation of the franchise for this district . . . , giving the sect exclusive control of the political subdivision," *ante,* at 698—implying that the "giving" of political power to the religious sect was the object of the "manipulation." There is no evidence of that. The special district was created to meet the special educational needs of distinctive handicapped children, and the geographical boundaries selected for that district were (quite logically) those that already existed for the village. It sometimes appears as though the shady "manipulation" JUSTICE SOUTER has in mind is that which occurred when the village was formed, so that the drawing of its boundaries infected the coterminous boundaries of the district. He says, for example, that "[i]t is undisputed that those who negotiated the village boundaries when applying the general village incorporation statute drew them so as to exclude

all but Satmars." *Ante,* at 699. It is indeed. But non-Satmars were excluded, not (as he intimates) because of their religion, but—as JUSTICE O'CONNOR clearly describes, see *ante,* at 712—because of their lack of desire for the high-density zoning that Satmars favored. It was a classic drawing of lines on the basis of communality of *secular governmental desires,* not communality of religion. What happened in the creation of the village is in fact precisely what happened in the creation of the school district, so that the former cannot possibly infect the latter, as JUSTICE SOUTER tries to suggest. Entirely secular reasons (zoning for the village, cultural alienation of students for the school district) produced a political unit whose members happened to share the same religion. There is *no* evidence (indeed, no plausible suspicion) of the legislature's desire to favor the Satmar religion, as opposed to meeting distinctive secular needs or desires of citizens who happened to be Satmars. If there were, JUSTICE SOUTER would say so; instead, he must merely insinuate.

## IV

But even if Chapter 748 were intended to create a special arrangement for the Satmars *because of* their religion (not including, as I have shown in Part I, any conferral of governmental power upon a religious entity), it would be a permissible accommodation. "This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie* v. *Unemployment Appeals Comm'n of Fla.,* 480 U. S. 136, 144–145 (1987). Moreover, "there is ample room for accommodation of religion under the Establishment Clause," *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U. S. 327, 338 (1987), and for "play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference," *Walz* v. *Tax Comm'n of City of New York,* 397

U. S. 664, 669 (1970). Accommodation is permissible, more-over, even when the statute deals specifically with religion, see, *e. g., Zorach* v. *Clauson,* 343 U. S., at 312–315, and even when accommodation is not commanded by the Free Exercise Clause, see, *e. g., Walz, supra,* at 673.

When a legislature acts to accommodate religion, particularly a minority sect, "it follows the best of our traditions." *Zorach, supra,* at 314. The Constitution itself contains an accommodation of sorts. Article VI, cl. 3, prescribes that executive, legislative, and judicial officers of the Federal and State Governments shall bind themselves to support the Constitution "by Oath or Affirmation." Although members of the most populous religions found no difficulty in swearing an oath to God, Quakers, Moravians, and Mennonites refused to take oaths based on Matthew 5:34's injunction "swear not at all." The option of affirmation was added to accommodate these minority religions and enable their members to serve in government. See 1 A. Stokes, Church and State in The United States 524–527 (1950). Congress, from its earliest sessions, passed laws accommodating religion by refunding duties paid by specific churches upon the importation of plates for the printing of Bibles, see 6 Stat. 116 (1813), vestments, 6 Stat. 346 (1816), and bells, 6 Stat. 675 (1836). Congress also exempted church property from the tax assessments it levied on residents of the District of Columbia; and all 50 States have had similar laws. See *Walz, supra,* at 676–678.

This Court has also long acknowledged the permissibility of legislative accommodation. In one of our early Establishment Clause cases, we upheld New York City's early release program, which allowed students to be released from public school during school hours to attend religious instruction or devotional exercises. See *Zorach, supra,* at 312–315. We determined that the early release program "accommodates the public service to . . . spiritual needs," and noted that finding it unconstitutional would "show a callous indifference

to religious groups." 343 U. S., at 314. In *Walz, supra,* we upheld a property tax exemption for religious organizations, observing that it was part of a salutary tradition of "permissible state accommodation to religion." *Id.,* at 672–673. And in *Presiding Bishop, supra,* we upheld a section of the Civil Rights Act of 1964 exempting religious groups from the antidiscrimination provisions of Title VII. We concluded that it was "a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Id.,* at 335.

In today's opinion, however, the Court seems uncomfortable with this aspect of our constitutional tradition. Although it acknowledges the concept of accommodation, it quickly points out that it is "not a principle without limits," *ante,* at 706, and then gives reasons why the present case exceeds those limits, reasons which simply do not hold water. "[W]e have never hinted," the Court says, "that an otherwise unconstitutional delegation of political power to a religious group could be saved as a religious accommodation." *Ibid.* Putting aside the circularity inherent in referring to a delegation as "otherwise unconstitutional" when its constitutionality turns on whether there is an accommodation, if this statement is true, it is only because we have never hinted that delegation of political power to citizens who share a particular religion could be unconstitutional. This is simply a replay of the argument we rejected in Part II, *supra.*

The second and last reason the Court finds accommodation impermissible is, astoundingly, the mere risk that the State will not offer accommodation to a similar group in the future, and that neutrality will therefore not be preserved. Returning to the ill fitted crutch of *Grendel's Den,* the Court suggests that by acting through this special statute the New York Legislature has eliminated any " 'effective means of guaranteeing' that governmental power will be and has been neutrally employed." *Ante,* at 703, quoting *Grendel's*

*Den,* 459 U. S., at 125. How misleading. That language in *Grendel's Den* was an expression of concern *not* (as the context in which it is quoted suggests) about the courts' ability to assure the legislature's future neutrality, but about the legislature's ability to assure the neutrality of the churches to which it had transferred legislative power. That concern is inapposite here; there is no doubt about the legislature's capacity to control what transpires in a public school.

At bottom, the Court's "no guarantee of neutrality" argument is an assertion of *this Court's* inability to control the New York Legislature's future denial of comparable accommodation. We have "no assurance," the Court says, "that the next similarly situated group seeking a school district of its own will receive one," since "a legislature's failure to enact a special law is . . . unreviewable." *Ante,* at 703; see also *ante,* at 716 (O'CONNOR, J., concurring in part and concurring in judgment).[4] That is true only in the technical (and irrelevant) sense that the later group denied an accommodation may need to challenge the grant of the first accommodation in light of the later denial, rather than challenging the denial directly. But one way or another, "even if [an administrative agency is] not empowered or obliged to act, [a litigant] would be entitled to a judicial audience. Ultimately, the courts cannot escape the obligation to address [a] plea that the exemption [sought] is mandated by the first amendment's religion clauses." *Olsen* v. *Drug Enforcement Admin.,* 878 F. 2d 1458, 1461 (CADC 1989) (R. B. Ginsburg, J.).

---

[4] The Court hints, *ante,* at 703, that its fears would have been allayed if the New York Legislature had previously created similar school districts for other minority religions. But had it done so, each of *them* would have been attacked (and invalidated) for the same reason as this one: because it had no antecedents. I am sure the Court has in mind some way around this chicken-and-egg problem. Perhaps the legislature could name the first four school districts *in pectore.*

The Court's demand for "up front" assurances of a neutral system is at war with both traditional accommodation doctrine and the judicial role. As we have described, *supra*, at 744, Congress's earliest accommodations exempted duties paid by specific churches on particular items. See, *e. g.*, 6 Stat. 346 (1826) (exempting vestments imported by "bishop of Bardstown"). Moreover, most efforts at accommodation seek to solve a problem that applies to members of only one or a few religions. Not every religion uses wine in its sacraments, but that does not make an exemption from Prohibition for sacramental wine use impermissible, accord, *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S., at 561, n. 2 (SOUTER, J., concurring in judgment), nor does it require the State granting such an exemption to explain in advance how it will treat every other claim for dispensation from its controlled-substances laws. Likewise, not every religion uses peyote in its services, but we have suggested that legislation which exempts the sacramental use of peyote from generally applicable drug laws is not only permissible, but desirable, see *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 890 (1990), without any suggestion that some "up front" legislative guarantee of equal treatment for sacramental substances used by other sects must be provided. The record is clear that the necessary guarantee can and will be provided, after the fact, *by the courts.* See, *e. g.*, *Olsen* v. *Drug Enforcement Admin., supra* (rejecting claim that peyote exemption requires marijuana exemption for Ethiopian Zion Coptic Church); *Olsen* v. *Iowa*, 808 F. 2d 652 (CA8 1986) (same); *Kennedy* v. *Bureau of Narcotics and Dangerous Drugs*, 459 F. 2d 415 (CA9 1972) (accepting claim that peyote exemption for Native American Church requires peyote exemption for other religions that use that substance in their sacraments).[5]

---

[5] The Court likens its demand for "up front" assurances to the Court's focus on the narrowness of the statute it struck down in *Texas Monthly, Inc.* v. *Bullock*, 489 U. S. 1 (1989). See *ante*, at 708. *Texas Monthly*

Contrary to the Court's suggestion, *ante*, at 708–709, I do not think that the Establishment Clause prohibits formally established "state" churches and nothing more. I have always believed, and all my opinions are consistent with the view, that the Establishment Clause prohibits the favoring of one religion over others. In this respect, it is the Court that attacks lions of straw. What I attack is the Court's imposition of novel "up front" procedural requirements on state legislatures. Making law (and making exceptions) one case at a time, whether through adjudication or through highly particularized rulemaking or legislation, violates, *ex ante*, no principle of fairness, equal protection, or neutrality simply because it does not announce in advance how all future cases (and all future exceptions) will be disposed of. If it did, the manner of proceeding of this Court itself would be unconstitutional. It is presumptuous for this Court to impose—*out of nowhere*—an unheard-of prohibition against proceeding in this manner upon the Legislature of New York State. I never heard of such a principle, nor has anyone else, nor will it ever be heard of again. Unlike what the New York Legislature has done, this *is* a special rule to govern only the Satmar Hasidim.

## V

A few words in response to the separate concurrences: JUSTICE STEVENS adopts, for these cases, a rationale that is

bears no resemblance to today's opinion, except that it also was wrong and it also misinterpreted *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664 (1970), see 489 U. S., at 33–40 (SCALIA, J., dissenting). The tax treatment of publishing companies in Texas was governed by an across-the-board rule. There was never any question whether nonreligious publishers would get the tax exemption accorded to religious publishers; by rule they did *not*, and the Court struck down that rule because it discriminated in favor of religion. By contrast, adjustments to existing school districts in New York are done case by case. No decision, including *Texas Monthly*, remotely suggests that approaching accommodations in a case-specific manner automatically violates the Establishment Clause.

almost without limit. The separate Kiryas Joel school district is problematic in his view because "[t]he isolation of these children, while it may protect them from 'panic, fear and trauma,' also unquestionably increased the likelihood that they would remain within the fold, faithful adherents of their parents' religious faith." *Ante,* at 711. So much for family values. If the Constitution forbids any state action that incidentally helps parents to raise their children in their own religious faith, it would invalidate a release program permitting public school children to attend the religious-instruction program of their parents' choice, of the sort we approved in *Zorach;*[6] indeed, it would invalidate state laws according parents physical control over their children, at least insofar as that is used to take the little fellows to church or synagogue. JUSTICE STEVENS' statement is less a legal analysis than a manifesto of secularism. It surpasses mere rejection of accommodation, and announces a positive hostility to religion—which, unlike all other noncriminal values, the State must not assist parents in transmitting to their offspring.

JUSTICE KENNEDY's "political-line-drawing" approach founders on its own terms. He concedes that the Constitution does not prevent people who share a faith from forming their own villages and towns, and suggests that the formation of the village of Kiryas Joel was free from defect. *Ante,* at 729–730. He also notes that States are free to draw political lines on the basis of history and geography. *Ante,* at 730. I do not see, then, how a school district drawn to mirror the boundaries of an existing village (an existing geographic line), which itself is not infirm, can violate the Constitution. Thus, while JUSTICE KENNEDY purports to share my criticism (Part IV, *supra*) of the Court's unprecedented insistence that the New York Legislature make its accommo-

---

[6] JUSTICE STEVENS' bald statement that such a program would be permissible, see *ante,* at 711–712, can exclude it from the reach of his opinion, but not from the reach of his logic.

dations only by general legislation, see *ante*, at 722, 726, his own approach is little different. He says the village is constitutional because it was formed (albeit by members of a single religious sect) under a general New York law; but he finds the school district unconstitutional because it was the product of a specific enactment. In the end, his analysis is no different from the Court's.

JUSTICE KENNEDY expresses the view that *School Dist. of Grand Rapids* v. *Ball,* 473 U. S. 373 (1985), and *Aguilar* v. *Felton,* 473 U. S. 402 (1985)—the cases that created the need for the Kiryas Joel legislation by holding unconstitutional state provision of supplemental educational services in sectarian schools—"may have been erroneous," and he suggests that "it may be necessary for us to reconsider them at a later date." *Ante,* at 731. JUSTICE O'CONNOR goes even further and expresses the view that *Aguilar* should be overruled. *Ante,* at 717–718. I heartily agree that these cases, so hostile to our national tradition of accommodation, should be overruled at the earliest opportunity; but meanwhile, today's opinion causes us to lose still further ground, and in the same antiaccommodationist direction.

Finally, JUSTICE O'CONNOR observes that the Court's opinion does not focus on the so-called *Lemon* test, see *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971), and she urges that that test be abandoned, at least as a "unitary approach" to all Establishment Clause claims, *ante,* at 721. I have previously documented the Court's convenient relationship with *Lemon,* which it cites only when useful, see *Lamb's Chapel* v. *Center Moriches Union Free School Dist.,* 508 U. S. 384, 397–401 (1993) (SCALIA, J., concurring in judgment), and I no longer take any comfort in the Court's failure to rely on it in any particular case, as I once mistakenly did, see *Lee* v. *Weisman,* 505 U. S. 577, 644 (1992) (SCALIA, J., dissenting). But the Court's snub of *Lemon* today (it receives only two "see also" citations, in the course of the opinion's description of

*Grendel's Den*) is particularly noteworthy because all three courts below (who are not free to ignore Supreme Court precedent at will) relied on it, and the parties (also bound by our case law) dedicated over 80 pages of briefing to the application and continued vitality of the *Lemon* test. In addition to the other sound reasons for abandoning *Lemon,* see, *e. g., Edwards* v. *Aguillard,* 482 U. S. 578, 636–640 (1987) (SCALIA, J., dissenting); *Wallace* v. *Jaffree,* 472 U. S. 38, 108– 112 (1985) (REHNQUIST, J., dissenting), it seems quite inefficient for this Court, which in reaching its decisions relies heavily on the briefing of the parties and, to a lesser extent, the opinions of lower courts, to mislead lower courts and parties about the relevance of the *Lemon* test. Compare *ante,* p. 687 (ignoring *Lemon* despite lower courts' reliance), with *Lamb's Chapel, supra* (applying *Lemon* despite failure of lower court to mention it).

Unlike JUSTICE O'CONNOR, however, I would not replace *Lemon* with nothing, and let the case law "evolve" into a series of situation-specific rules (government speech on religious topics, government benefits to particular groups, etc.) unconstrained by any "rigid influence," *ante,* at 721. The problem with (and the allure of) *Lemon* has not been that it is "rigid," but rather that in many applications it has been utterly meaningless, validating whatever result the Court would desire. See *Lamb's Chapel, supra,* at 399 (SCALIA, J., concurring in judgment); *Wallace, supra,* at 110–111 (REHNQUIST, J., dissenting). To replace *Lemon* with nothing is simply to announce that we are now so bold that we no longer feel the need even to pretend that our haphazard course of Establishment Clause decisions is governed by any principle. The foremost principle I would apply is fidelity to the longstanding traditions of our people, which surely provide the diversity of treatment that JUSTICE O'CONNOR seeks, but do not leave us to our own devices.

\*   \*   \*

The Court's decision today is astounding. Chapter 748 involves no public aid to private schools and does not mention religion. In order to invalidate it, the Court casts aside, on the flimsiest of evidence, the strong presumption of validity that attaches to facially neutral laws, and invalidates the present accommodation because it does not trust New York to be as accommodating toward other religions (presumably those less powerful than the Satmar Hasidim) in the future. This is unprecedented—except that it continues, and takes to new extremes, a recent tendency in the opinions of this Court to turn the Establishment Clause into a repealer of our Nation's tradition of religious toleration. I dissent.