*1489 MANSMANN, Circuit Judge,
dissenting, joined by Judges NYGAARD, ALITO and ROTH.
I must dissent because I believe the issue squarely before us, whether student-initiated, -directed and -composed prayer at high school graduation violates the First Amendment, requires that we examine the application of both the Establishment Clause and the free exercise/free speech right, balancing the graduates’ free exercise and speech rights against any compelling state interest which might otherwise justify impinging these guarantees.
In placing these interests on the balance scale, I am concerned, however, that an approach which exaggerates and emphasizes the Court’s Establishment Clause tests would be fragmented and would tend to imply that the First Amendment religion clauses embody contradictory and irreconcilable principles. The Court’s free exercise jurisprudence clearly suggests that a separation policy which overextends into the domain of free exercise and free speech must be suspect. The Establishment Clause should not be read to prohibit activity which the Free Exercise Clause protects. Board of Educ. v. Morgens, 496 U.S. 226, 250, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990) (“there is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect”). Thus, I would analyze the present case in light of the fact that while the state may not establish a religion, it must not also disadvantage or discriminate against student religious activity, nor imply that religion, or religious acts, are disfavored.
In light of the Establishment Clause’s broad purpose to serve the free exercise of religion, I would hold that here the narrowly fact-bound holding of Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), does not preclude such student directed, composed and delivered prayer as an integral segment of the graduation ceremony, where there is not, by policy, virtually any school administration or faculty involvement. In addition, applying the Court’s three-part Establishment Clause analysis articulated in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), I would hold that the defendants’ challenged activity also meets the Lemon test as to compliance with the Establishment Clause. Finally, I would conclude that the state has not articulated any compelling interest to countermand the graduates’ rights of free exercise and free expression. Thus, I would reverse the permanent injunction issued against the defendants.
I.
In Lee v. Weisman, the Court held that Lee, a middle school principal who decided to include prayer in the graduation ceremony for Deborah Weisman, chose a rabbi to offer the prayer, gave the rabbi guidelines on the content of the prayer, and advised the rabbi that the invocation should be non-sectarian, made choices attributable to the state. Moreover, the Court held that Lee’s advice concerning the content of the rabbi’s prayer constituted direct state control. These findings, combined with the Court’s finding that the school’s supervision and control of high school graduation subtlely coerced graduates to stand in respectful silence during the invocation, rendered the state action unconstitutional, despite the fact that participation in the prayer or in the graduation ceremony itself was voluntary. 505 U.S. at 586-89, 112 S.Ct. at 2655-56. Emphasizing that the particular facts in the case were outcome-determinative, the Court stated:
These dominant facts mark and control the confines of our decision: State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools. Even for those students who object to the religious exercise, their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma.
505 U.S. at 586, 112 S.Ct. at 2655.
Adverting to the “heightened concerns with protecting freedom of conscience from *1490 subtle coercive pressure in the elementary and secondary public schools,” id. at 592, 112 S.Ct.at 2658, the Court asserted that the effort on the part of the school official to “monitor prayer will be perceived by the students as inducing a participation. they might otherwise reject.” Id. at 590, 112 S.Ct. at 2657. The Court declined to apply the factors it earlier set forth in Lemon v. Kurtzman, or to explicitly reconsider the status of that decision.[1]
Because of the highly fact-sensitive nature of the Lee decision, I cannot induce from the Court’s reasoning any broad constitutional principle which bans prayer at all high school graduation ceremonies, regardless of the manner in which the decision to include prayer is made or implemented. Indeed, Lee bids us to scrutinize and to distinguish the facts of each case. In Lee the Court found the following, working in tandem, to constitute state sponsorship:
1) The high school principal, a state actor, made a unilateral decision to include an invocation and benediction in the graduation ceremony;
2) The high school principal, a state actor, made a unilateral decision with regard to the selection of a clergyman to offer the invocation and benediction; and
3)The high school principal, a state actor, actively influenced and monitored the content of the invocation and benediction to be given.
The ease before us contains neither the indicia of state action nor the particular facts which were outcome determinative in Lee. Here the graduates are entirely entrusted with the decision to include or not to include a graduation invocation.[2] The graduates maintain control throughout the decisional process and without the active or surreptitious influence or monitoring by school officials. Policy IKFD precludes the invitation of a clergyman to deliver any invocation. No school official may influence or monitor the content of the prayer. The polling instrument itself is neutral. The government practice in question here is not a decision to include prayer at graduation; nor is it the practice of monitoring or influencing the content of a graduation prayer. The government practice at issue here is the highly democratic one of allowing the graduating class to vote on the issue of graduation prayer while maintaining an official stance of strict neutrality throughout the entire process. Hence, none of the decisions made by the graduating class concerning graduation prayer can be attributed to the state and the Establishment Clause is therefore not even implicated.[3] I do not find anything in Lee *1491 which would compel a holding that policy IKFD is unconstitutional.
The majority expresses concern over the degree of control exercised by the school: 1) when it rejected a student’s request for a “safe sex” speaker at graduation, and 2) when the principal stated that he would not permit an unscheduled speaker. Certainly the school, without violating the neutrality principles of Lemon, could restrict all speeches as to time and indeed as to appropriateness — here, to “solemnizing” speech; Policy IKFD’s subject matter and speaker restrictions do not constitute viewpoint expression or suppression.[4]
I would follow the lead of our sister court of appeals in Jones v. Clear Creek Indep. Sch. Dist., 977 F.2d 963 (5th Cir.1992),[5] a graduation prayer ease factually similar to the case before us. In Jones, the Supreme Court vacated the Fifth Circuit’s judgment and remanded the case for further consideration in light of the Court’s decision in Lee v. Weisman, which the Court decided subsequent to the Fifth Circuit’s first determination. Upon reconsideration, the Fifth Circuit held that Lee did not invalidate Clear Creek’s graduation and invocation policy, which did not mandate prayer or any invocation, but merely permitted graduation prayer to be delivered by a graduate if the graduating class so chose. Moreover, in Jones the resolution in question permitted a school official to offer “advice and counsel” to the graduating class in the decision whether to include an invocation at graduation. This single fact, which is absent in the case before us, placed the Jones case even closer to the constitutional boundary established in Lee than the case before us. Nevertheless, the Fifth Circuit held that Clear Creek exercised significantly less control over the invocation content than did the school principal in Lee v. Weisman, noting that Clear Creek did not solicit invocations, but merely refused to accept sectarian or proselytizing invocations. 977 F.2d at 971. The court noted that the resolution merely tolerated nonsectarian, non-proselytizing prayer, but neither required nor favored it. Id.
*1492 By contrast, Black Horse’s policy for prayer at graduation ceremonies is more liberal in that it extends the scope of its toleration to include even sectarian prayer, if the graduates so choose. I believe that in this way Policy IKFD comports with the First Amendment’s prohibition against the inhibition of the practice of religion or of free expression, while at the same time precludes even the remote possibility of an establishment of religion by virtue of its uncompromising neutrality.
I would also find the element of psychological coercion, which the Lee Court presumed and the majority stresses, to be absent where the graduating seniors have participated in the decision regarding prayer at graduation. There could not be any confusion on the part of the reasonable graduating senior, who has been made aware of the senior class poll and has been invited to participate, with regard to whether the result of that poll represents an official opinion of the state or the will of the senior class. Furthermore, although Lee failed to emphasize the distinction between high school graduates and the rest of the younger, less mature high school student body, prior Supreme Court caselaw has acknowledged that post-secondary school students are less easily coerced than younger students. See, e.g., Board of Educ. of Westside Community Schools v. Mergens, 496 U.S. 226, 235-37, 250, 110 S.Ct. 2356, 2364-65, 2371, 110 L.Ed.2d 191 (1990) (“university students are ... less impressionable than younger students”) (citing Widmar v. Vincent, 454 U.S. 263, 274, n. 14, 102 S.Ct. 269, 276, n. 14, 70 L.Ed.2d 440 (1981)). The graduation ceremony itself is a public ritual symbolic of the graduates’ passage into responsible young adulthood, and is synchronized, more or less, with other official ac-knowledgements of adult initiation, such as conference of the right to vote and the responsibility of males to register for the draft.
In addition to the relative level of maturity of the senior class, the very nature of graduation, which elevates the student to the status of graduate, must be considered. Although the student/graduate distinction did not countermand the other various facts which the Court in Lee weighed against graduation prayer, I believe that the graduation ceremony setting is significantly different in nature from the classroom setting, and in the absence of other offending factors, warrants a less restrictive approach to religion. Certainly the contested activity does not involve the curriculum of the school; nor does the graduation ceremony implicate the teacher-student relationship concerning the transmission of knowledge from the former to the latter. Thus, the concerns which the Court has expressed in those eases where some form of religion has been injected into the school curriculum are not directly operative here. See, e.g., Edwards v. Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (teaching of scientific evidence supporting creation theory); Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (moment of silence at beginning of each school day); Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (posting of Ten Commandments on classroom walls); Abington School Dist. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Bible reading over PA system before classes); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (mandated recitation of official state prayer each day in public schools); Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948) (weekly religious instruction in public school buildings during school hours by members of clergy).
I do not share the majority’s confidence in the Ninth Circuit’s holding in Harris v. Joint Sch. Dist. No. 241, 41 F.3d 447 (9th Cir.1994), cert. granted, vacated and remanded, - U.S. -, 115 S.Ct. 2604, 132 L.Ed.2d 849 (1995). Following the precedent set by an earlier Ninth Circuit ease, Collins v. Chandler Unified Sch. Dist., 644 F.2d 759 (9th Cir.), cert. denied, 454 U.S. 863, 102 S.Ct. 322, 70 L.Ed.2d 163 (1981), the court in Harris held that “the school ultimately controls [the graduation] event” and hence cannot avoid state involvement so as to implicate the Establishment Clause as interpreted under Lee. 41 F.3d at 454. The court further held that the seniors’ decision regarding prayer was per se tainted with official sanction because the seniors derived their deci-sional authority from the delegation of offi *1493 cial school authority and because “the school under[wrote] the [graduation] event” by providing the use of the school building. Id. In my view, this holding would preclude virtually all prayer at a public high school graduation ceremony, a holding which unnecessarily and without warrant extends the holding of Lee. I am also concerned that the Ninth Circuit failed to distinguish the classroom setting from the graduation setting, and the student from the graduate. 41 F.3d at 458. I find no precedent supporting the Ninth Circuit’s position that public high school seniors “enter[] the domain of the Establishment Clause,” id., and are precluded from independently choosing to communally express their gratitude to God, invoke the divine presence or seek God’s blessing, as part of their graduation ceremony. Since all aspects of the graduation prayer decision are at the discretion of the graduating senior class, I would hold that Policy IKFD does not unconstitutionally establish a religion under Lee.
II.
I agree with the majority that the Lemon test is still precedential, although from the start it has been the focus of critical debate, including the irony that its application encourages the federal courts to regulate in an area for which the First Amendment was designed to insure against any government interference.[6] I part company in that I be *1494 lieve that Policy IKFD does not violate any one of the three elements of Lemon.
A.
In order to pass the first prong of the Lemon test, Policy IKFD need not be shown to be exclusively secular. Lynch v. Donnelly, 465 U.S. 668, 681 n. 6, 104 S.Ct. 1355, 1363, n. 6, 79 L.Ed.2d 604 (1984); Wallace v. Jaffree, 472 U.S. at 64, 105 S.Ct. at 2493 (Powell, J., concurring). Furthermore, accommodation of religion or religious practice in general helps to preserve the mediating institutions of the public morals, a secular civic good. Hence, accommodation itself serves a secular purpose. A valid secular purpose is not constitutionally compromised when there are incidental, even substantial, benefits to religion. Lynch, 465 U.S. at 680, 104 S.Ct. at 1362 {citing Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971)).
To determine a secular purpose, the Court generally has exercised deference with regard to stated legislative or policy purpose, and will find a sham secular purpose only when there can be no question that the challenged conduct establishes, or tends to establish, a religion. Aguilar v. Felton, 473 U.S. 402, 416-17, 105 S.Ct. 3232, 3239-40, 87 L.Ed.2d 290 (1985) (Powell, J., concurring); Lynch, 465 U.S. at 680, 104 S.Ct. at 1362 (“The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations.”) (citing Stone v. Graham, 449 U.S. at 41, 101 S.Ct. at 193; Epperson v. Arkansas, 393 U.S. 97, 107-09, 89 S.Ct. 266, 272-73, 21 L.Ed.2d 228 (1968); Abington School Dist. v. Schempp, 374 U.S. at 223-24, 83 S.Ct. at 1572-73; Engel v. Vitale, 370 U.S. at 424-25, 82 S.Ct. at 1263-64); see also Edwards v. Aguillard, 482 U.S. at 586-87, 107 S.Ct. at 2579-80.
Policy IKFD expressly states, “[ijn the spirit of protected free speech, the pupils in attendance must choose to have prayer ....” (emphasis added). In addition to this express secular purpose of promoting the free speech of the graduating seniors, the school asserts that Policy IKFD serves the valid secular purpose of permitting the graduates to solemnize the occasion of their graduation through ceremonial prayer. The concern should not be, as the majority expresses it, that graduation would not be less solemn without the vote. The importance of ceremonial prayer is that the Court has acknowledged that it indeed serves the valid secular purpose of solemnization. See, e.g., Lynch, 465 U.S. at 693, 104 S.Ct. at 1369 (O’Connor, J., concurring); County of Allegheny v. Greater Pittsburgh ACLU, 492 U.S. 573, 595-96 n. 46, 109 S.Ct. 3086, 3102-03 n. 46, 106 L.Ed.2d 472 (1989); Engel v. Vitale, 370 U.S. at 435 n. 21, 82 S.Ct. at 1269 n. 21 (1962); see also Jones v. Clear Creek Indep. Sch. Dist., 977 F.2d at 966-67.
As the district court noted in the present case, Policy IKFD serves yet a third secular purpose which is educational, albeit not curriculum-related, in that the process of independently coordinating and resolving the issue of graduation prayer permits the prospective graduates to gain firsthand insight into the effects of current constitutional jurisprudence on their public behavior, and is itself an exercise in responsible citizenship.
Moreover, the challenged activity here cannot be deemed to cause those graduates who are opponents of prayer at graduation, for the many different reasons cited by the majority, to feel that they are not fully incorporated into the community. To the contrary, every graduate under Policy IKFD is fully invited to partake in the community via the right to vote on the issue of school prayer, and each individual graduate, regardless of his or her position on the issue, has an equal *1495 opportunity to influence the graduation ceremony. Here the challenged activity is a democratic exercise. There is no guarantee that the view that prevails in any given year will prevail in the following year. The reasonably tolerant graduate, knowing of his or her opportunity to partake in the class poll, cannot reasonably be thought to conclude that the state is establishing religion if prayer prevails in the poll in any given year. The non-endorsing language of Policy IKFD, the explicit mandatory disclaimer, and the neutrality of the polling instrument itself, would lead me to hold that the effect of Policy IKFD is not principally or primarily to advance religion. On the other.hand, an absolute prohibition on ceremonial prayer at graduation would, in my view, violate the Free Exercise Clause by unduly inhibiting the practice of religion, and would also implicate the free speech guarantees of the First Amendment.
Given the school’s highly credible express secular motivations and neutrality of purpose as regards religion,[7] both written into Policy IKFD and argued before us, I would find that Policy IKFD easily passes the secular purpose test. The ACLU’s assertions that Policy IKFD cannot satisfy this prong of Lemon because prayer is per se religious[8] and that ceremonial prayer may not be utilized for purposes of solemnization or freedom of expression where wholly secular means are available, go far beyond the requirements of the first prong of Lemon, which does not require that a secular purpose be achieved via exclusively secular means. Furthermore, the means employed by the school towards its secular end pursuant to Policy IKFD is not itself intrinsically religious. Student polling is a wholly secular activity, and the result of the poll in question is the expression of the graduating class, not the school district.
B.
With respect to the second prong of the Lemon test, I agree that the test asks whether the challenged activity “in fact conveys a message of endorsement or disapproval.” Lynch, 465 U.S. at 690, 104 S.Ct. at 1368. While it is solidly established that the government is precluded from favoring one particular religious denomination over another, or from establishing an official state religion, I note that the members of the Court divide as to whether the Establishment Clause precludes the government from conveying a message that it endorses or encourages religion in a generic sense, or especially' acknowledges or accommodates the broad Ju-deo-Christian heritage of our civil and social order. This division persists despite the Court’s attempt to interpret comprehensively the Establishment Clause in Everson v. Board of Education, 380 U.S. 1, 15-16, 67 S.Ct. 504, 511-12, 91 L.Ed. 711 (1947), holding that the First Amendment prohibits the federal and state governments from offering non-preferential aid to all religions and from levying any tax to support any religious activity or institution. See, e.g., Wallace, 472 U.S. at 70, 105 S.Ct. at 2497 (O’Connor, J., concurring) (“[The endorsement test] does preclude government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred”); but cf. Wallace, 472 U.S. at 98, 105 S.Ct. at 2511 (Rehnquist, J., dissenting) (“[Madison] did not see [the First Amendment] as requiring neutrality on the part, of government between religion and irreli-gión.”); Zorach v. Clauson, 343 U.S. 306, 313, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952) (‘We are a religious people whose institutions presuppose a Supreme Being.”); Marsh v. Chambers, 463 U.S. 783, 792, 103 S.Ct. 3330, 3336, 77 L.Ed.2d 1019 (1983) (“To invoke Divine guidance on a public body ... is *1496 not ... an ‘establishment’ ... or a step toward establishment; it is simply a tolerable acknowledgement of beliefs widely held among the people of this Country.”); Lynch, 465 U.S. at 678, 104 S.Ct. at 1359 (The Constitution “affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any.... ‘[C]allous indifference’ ... was never intended by the Establishment Clause .... [and] would bring us into ‘war with our national tradition as embodied in the First Amendment’s guaranty of the free exercise of religion.’ ” (citations omitted)). In Mergens, the Supreme Court unequivocally held that:
The Establishment Clause does not license government to treat religion and those who teach or practice it, simply by virtue of their status as such, as subversive of American ideals and therefore subject to unique disabilities.
Mergens, 496 U.S. at 248, 110 S.Ct. at 2371. See also Rosenberger v. Rector & Visitors of University of Va., — U.S.-,-, 115 S.Ct. 2510, 2522, 132 L.Ed.2d 700 (1995) (where government program is neutral toward religion (as Policy IKFD is), restrictions on religious speech are not justified by the Establishment Clause); such viewpoint discrimination risks fostering hostility to religion, undermining the very neutrality of the Establishment Clause requires, id. at-, 115 S.Ct. at 2525.
The First Amendment does not condemn legislation or official policy that has the effect of assisting religion generally; the First Amendment itself gives religion an exceptionally protected status. It does not necessitate an interpretation inhospitable to religion where religion may not be acknowledged in any public arena. Such an interpretation runs counter to the notion of neutrality and denigrates religion in violation of the Free Exercise Clause. See Lynch v. Donnelly, 465 U.S. 668, 673, 104 S.Ct. 1355, 1359, 79 L.Ed.2d 604 (1983) (the Constitution does not “require the complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility towards any_ Indeed ... such hostility would bring us into “war with our national tradition as embodied in the First Amendment’s guaranty of the free exercise of religion.’ ’.’). Neutrality may be achieved through a policy, such as Policy IKFD, that is as hospitable to religion as it is to irreli-gión.
The majority’s “reasonable' nonadherent” could not be confused into thinking that “his or her religious choices were disfavored.” Opinion at 1487. Policy IKFD mandates an explicit and unequivocal disclaimer, one that covers not only the official position of the school but also the views of any of the particular graduates, on the graduation program in the event the student body votes for the inclusion of prayer at the graduation ceremony.[9] Moreover, the outright ban on graduation prayer that the majority espouses would make a reasonable religionist believe that his or her exercise of religion was disfavored by the state, especially against the pervasive backdrop of a century and a half of prayer at such gatherings.
C.
Because I find that the first two Lemon prongs are not violated, I (unlike the majority) must move to the third prong, whether Policy IKFD fosters excessive institutional entanglement between the church and the state. Lemon discusses two ways in which entanglement can be excessive. Entanglement may be implicated when a state policy or legislative act draws the state into an intimate and continual monitoring or over *1497 seeing of religious matters. 408 U.S. at 614-22, 91 S.Ct. at 2112-16. Entanglement may also be implicated where a state policy or legislative act creates an abnormal potential for political divisiveness. 403 U.S. at 622, 91 S.Ct. at 2115. The Court has indicated, however, that political divisiveness alone will not create an entanglement. Lynch, 465 U.S. at 684, 104 S.Ct. at 1365 (“... this Court has not held that political divisiveness alone can serve to invalidate otherwise permissible conduct”). The Court has also recognized that “[e]ntanglement is a question of kind and degree.” Lynch, 465 U.S. at 684, 104 S.Ct. at 1365.
I find nothing in Policy IKFD which resembles the enduring entanglement identified in Lemon. By design Policy IKFD creates a virtual total absence of administrative entanglement of any sort. With regard to political divisiveness, Policy IKFD involves absolutely no sponsorship or subsidy to any religious institution or related organization. There is nothing in the record which would suggest that Policy IKFD engenders or will engender so high a degree of political divisiveness as to pose “a threat to the normal political process.” Lemon, 403 U.S. at 622, 91 S.Ct. at 2116 (citations omitted). On the other hand, I would not attribute the political divisiveness, to whatever extent it may or may not exist, which this lawsuit itself engenders, to Policy IKFD. See Lynch, 465 U.S. at 684-85, 104 S.Ct. at 1365 (“A litigant cannot, by the very act of commencing a lawsuit, ... create the appearance of divisiveness and then exploit it as evidence of entanglement.”) I do not find any evidence of excessive entanglement and am thus satisfied that Policy IKFD satisfies all three prongs of the Lemon test.
III.
In closing, I must challenge the majority’s view that “the prevalence of religious beliefs and imagery cannot erode the state’s obligation to protect the entire spectrum of religious preferences from the most pious wor-shipper to the most committed atheist.” Opinion at 1488. The Free Exercise Clause guarantees against the interference of the state in expressive and assoeiational religious activity. The free speech clause is a related, but more generic, guarantee for a broad range of expressive and assoeiational activity. It is well-acknowledged that neither clause offers unlimited protection for such activities. It is equally well-acknowledged that the state may not impinge the interests of free exercise and free speech without proffering a compelling state interest and demonstrating the necessity of its restrictive action.
Aside from the ACLU’s assertion that Policy IKFD establishes or tends to establish a religion, it offers no compelling reason, constitutional or otherwise, for a permanent injunction against a senior class’ free choice to express thanks through its own prayer at a graduation ceremony. Thus, I believe the free exercise and free expression interests of the graduating class of Highland Regional High School must prevail.

. The Court stated:
We can decide the case without reconsidering the general constitutional framework by which public schools' efforts to accommodate religion are measured. Thus we do not accept the invitation of petitioners and amicus the United States to reconsider our decision in Lemon v. Kurtzman [.] The government involvement with religious activity in this case is pervasive, to the point of creating a state-sponsored and state-directed religious exercise in a public school. Conducting this formal religious observance conflicts with settled rules pertaining to prayer exercises for students, and that suffices to determine the question before us.
505 U.S. at 587, 112 S.Ct. at 2655.

. I am satisfied that the school’s stated purpose accurately reflects its purpose in fact and that Policy IKFD does not mask an impermissible covert intention to promote official prayer. The district judge, who had the opportunity to observe the parties and determine firsthand their credibility in hearings, stated in his denial of the preliminary injunction:
I want to again emphasize that when I approached this case I tried to be sensitive to sham, A. because I don’t like it and B. because I don't like to make any decision, let alone a constitutional one, on pretense. And had I gotten the notion that the school board was hell bent on — excuse the expression — hell bent on having prayer and that the student vote was going to have prayer one way or the other and the student vote was just [a] kind [of] mechanism they were going to manipulate to see to it ... I assure you my ruling would be different. I was again particularly impressed with the sense [that] the testimony of the principal [was straight forward] ... I was convinced he would not stand still for a sham, that he would do what he thought was the right thing, even if he found it personally uncomfortable to do....
A. 170-71.

.In his plurality opinion in Capitol Sq. Review & Advisory Bd. v. Pinette, -U.S.-, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), Justice Scalia (joined by Rehnquist, Kennedy and Thomas) wrote:
Where we have tested for endorsement of religion, the subject of the test was either expression by the government itself, or else govern *1491 ment action alleged to discriminate in favor of private religious expression or activity. The test petitioners propose, which would attribute to a neutrally behaving government private religious expression, has no antecedent in our jurisprudence and would better be called to a transferred endorsement test.
- U.S. at-, 115 S.Ct. at 2447-48 (emphasis in original).

. Even if this particular graduation ceremony were converted into a public forum or limited public forum, an issue we need not reach, it would be subject to reasonable time, place and manner restrictions, and to content-based restrictions necessary to serve a compelling state purpose. Brody v. Spang, 957 F.2d 1108, 1117 (3d Cir.1992).
The very concept of a public forum, however, precludes that the state either endorse or disapprove of the speech, including religious speech, which is communicated in a public forum. See Capitol Sq. Review & Advisory Bd. v. Pinette, - U.S. -, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995); Chabad-Lubavitch of Georgia v. Miller, 5 F.3d 1383, 1393 (11th Cir.1993). Religious speech in an open public forum does not confer the state's endorsement on religious sects or practices, and cannot be deemed to have the primary effect of advancing religion. Id. at 1392; Widmar v. Vincent, 454 U.S. 263, 274, 102 S.Ct. 269, 276, 70 L.Ed.2d 440 (1981); Board of Educ. of Westside Community Schools v. Mergens, 496 U.S. 226, 248, 110 S.Ct. 2356, 2370, 110 L.Ed.2d 191 (1990) (the nature of a public forum is such that “the message [of inclusion] is one of neutrality rather than endorsement; if a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion”). The establishment clause should not be used for imposing content-based restrictions on religious speech in a public forum under the appropriate strict scrutiny analysis.
We did recognize in Brody v. Spang, 957 F.2d at 1120, that commencement exercises at a public high school could qualify as a public forum. Restrictions on the use of the forum or on the class of speakers does not necessarily render the forum non-public. See id. at 1117-18 and citations therein. The subject matter and category of speaker restrictions of Policy IKFD are arguably compatible with the concept of a limited public forum. See also Adler v. Duval County Sch. Bd., 851 F.Supp. 446, 454 (M.D.Fla.1994); but cf. Lundberg v. West Monona Community School District, 731 F.Supp. 331, 337 (N.D.Iowa 1989).

. I note its subsequent history: reh'g en banc, denied, 983 F.2d 234 (5th Cir.1992), and mot. granted, cert. denied, 508 U.S. 967, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993), and that.the court of appeals reaffirmed Jones in Ingebretsen v. Jackson Public Sch. Dist., 88 F.3d 274, 281 (5th Cir.1996), 64 U.S.L.W. 2443 (Jan. 10, 1996).

. There has been much commentary critical of the Lemon test, but it suffices here to call attention to the divisions which Lemon has engendered in the Court itself. First, most recently the Court has begun to address the establishment clause issue with little or no resort to the Lemon test. See Lee v. Weisman, 505 U.S. at 586, 112 S.Ct. at 2655, and Board of Education of Kiryas Joel v. Grumet, — U.S.-, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994). In Lee, Justice Scalia, joined by Chief Justice Rehnquist, Justice White and Justice Thomas, dissenting, unequivocally stated:
Our religion-clause jurisprudence has become bedeviled (so to speak) by reliance on formulaic abstractions that are not derived from, but positively conflict with, our long-accepted constitutional traditions. Foremost among these has been the so-called lemon test, [citation omitted], which has received well-earned criticism from many members of this Court. [Citations omitted] The Court today demonstrates the irrelevance of Lemon by essentially ignoring it ... and the interment of that case may be the one happy by-product of the Court's otherwise lamentable decision.
505 U.S. at 643, 112 S.Ct. at 2685.
Again in Kiryas Joel, Justice Scalia, joined by Chief Justice Rehnquist and Justice Thomas, stated:
[T]he Court’s snub of lemon today ... is particularly noteworthy because all three courts below (who are not free to ignore Supreme Court precedent at will) relied on it, and the parties (also bound by our case law) dedicated over 80 pages of briefing to the application and continued vitality of the Lemon test. In addition to the other sound reasons for abandoning Lemon, [citations omitted], it seems quite inefficient for this Court, which in reaching its decisions relies heavily on the briefing of the parties and, to a lesser extent, the opinions of lower courts, to mislead lower courts and parties about the relevance of the Lemon test. -U.S. at-, 114 S.Ct. at 2515. See also - U.S. at -, 114 S.Ct. at 2500 (O’Connor J., concurring in part and concurring in the judgment) ("[T|he slide away from lemon's unitary approach is well under way.”); Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (upholding state action against establishment clause challenge without reference to Lemon ). Even where the Lemon test has been applied, members of the Court have openly recommended abandoning it. See Allegheny County v. Greater Pittsburgh ACLU, 492 U.S. 573, 655, 109 S.Ct. 3086, 3134, 106 L.Ed.2d 472 (1989) (Kennedy, J., joined by Rehnquist, C.J., White, J. and Scalia, J., concurring in the judgment in part and dissenting in part) ("I ... do not wish to be seen as advocating, let alone adopting, [the Lemon test] as our primary guide in this difficult area.”); Corporation of Presiding Bishop v. Amos, 483 U.S. 327, 346, 107 S.Ct. 2862, 2873, 97 L.Ed.2d 273 (1987) (O’Connor, J., concurring in the judgment); Edwards v. Aguillard, 482 U.S. 578, 636-40, 107 S.Ct. 2573, 2605-07, 96 L.Ed.2d 510 (1987) (Scalia, J., joined by Rehnquist, C.J., dissenting) (especially.recommending abandoning the "purpose-prong” because it "exacerbates the tension between the Free Exercise and Establishment Clauses, [and] has no basis in the language or history of the Amendment” Ld. at 640, 107 S.Ct. at 2607); Grand Rapids School District v. Ball, 473 U.S. 373, 400, 105 S.Ct. 3216, 3231, 87 L.Ed.2d 267 (1985) (White, J., dissenting); Wallace v. Jaffree, 472 U.S. 38, 68-69, 105 S.Ct. 2479, 2495-97, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring in the judgment) ("the standards announced in Lemon should be reexamined and refined”); 472 U.S. at 107-10, 105 S.Ct. at 2515-18 (Rehnquist, J., dissenting) (“the Lemon test has no more grounding in the history of the First Amendment than does the wall theory upon which it rests.... [It] has caused this Court to fracture into unworkable plurality opinions.” Id. at 110, 105 S.Ct. at 2517.); New York v. Cathedral Academy, 434 U.S. 125, 134-35, 98 S.Ct. 340, 346-47, 54 L.Ed.2d *1494 346 (1977) (White, J., dissenting); Roemer v. Maryland Public Works Bd., 426 U.S. 736, 768-69, 96 S.Ct. 2337, 2355-56, 49 L.Ed.2d 179 (1976) (White, J., joined by Rehnquist, J., concurring in the judgment) (especially criticizing the entanglement prong and stating that Lemon imposes unnecessary and superfluous tests).

. See n. 2 supra.

. I accept the proposition that prayer is inherently a religious act, but a policy allowing prayer if die students so choose is a step removed from the act of prayer. Certainly a single, spoken prayer at a graduation could not have the primary effect of advancing religion as required by Lemon.
The contents of the prayer intended to be delivered at Highland Regional High School prior to the issuance of the preliminary injunction has not been made a part of the record before us. Thus the prayer may be the announcement of the speaker's own expression of belief and more akin to speech than religion.

. In Lee, Justice Scalia, dissenting, explained:
Given the odd basis for the Court’s decision, invocations and benedictions will be able to be given at public-school graduations next June, as they have for the past century and a half, so long as school authorities make clear that anyone who abstains from screaming in protest does not necessarily participate in the prayers. All that is seemingly needed is an announcement, or perhaps a written insertion at the beginning of the graduation Program, to the effect that, while all are asked to rise for the invocation and benediction, none is compelled to join in them, nor will be assumed, by rising, to have done so. That obvious fact recited, the graduates and their parents may proceed to thank God, as Americans have always done, for the blessings He has generously bestowed on them and on their country.
505 U.S. at 644-45, 112 S.Ct. at 2685.